ORIGINAL

1  DEBRA S. BELAGA (S.B. #83237)
   O'MELVENY & MYERS LLP
2  Two Embarcadero Center, 28th Floor
   San Francisco, CA 94111-3823
3  Telephone:   (415) 984-8700
   Facsimile:    (415) 984-8701
4
5  DANIEL M. PETROCELLI (S.B. #97802)
   DAVID J. MARROSO (S.B. #211655)
   O'MELVENY & MYERS LLP
6  1999 Avenue of the Stars, 7th Floor
   Los Angeles, CA 90067-6035
7  Telephone:   (310) 553-6700
   Facsimile:    (310) 246-6779
8
   Attorneys for Defendants Lennar Land Partners
9  II, LLP II HCC Holdings, LLC, Lennar Homes
   of California, Inc., Lennar Corporation, Stuart
10 A. Miller, Jonathan M. Jaffe, Richard Beckwitt,
   and HCC Investors LLC
11

FILED

2009 NOV 30  PM 1: 33

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

12          **UNITED STATES DISTRICT COURT**

13         **SOUTHERN DISTRICT OF CALIFORNIA**

14

15  BRIARWOOD CAPITAL, LLC, a
    Delaware limited liability            Case No.
16  company, individually and
    derivatively on behalf of            '09 CV 2680 BEN AJB
    KRMW REAL ESTATE INVESTMENT
17  GROUP, LLC; NICOLAS MARSCH III,      **NOTICE OF REMOVAL OF**
    an individual; COLONY PROPERTIES     **ACTION UNDER 28 U.S.C. § 1441(b)**
18  INTERNATIONAL, LLC, a California     **(FEDERAL QUESTION)**
    limited liability company; and COLONY
19  PROPERTIES INTERNATIONAL II, a       (San Diego County Superior Court,
    California limited liability company,  Central Division, Case No. 37-2009-
20                                         00100835-CU-BC-CTL)
                Plaintiffs,
21
        vs.
22
    KBR GROUP, LLC, a California limited
23  liability company; KBR OPPORTUNITY
    FUND I, L.P., a California limited
24  partnership; KBR OPPORTUNITY FUND
    II, L.P., a California limited partnership;
25  SHAWN R. WAMSTAD, an individual;
    MICHEL KUCINSKI, an individual;
26  RANDY RIVERA, an individual;
    LENNAR CORPORATION, a Delaware
27  corporation; LENNAR LAND PARTNERS
    II, a Florida general partnership; LLP II
28  HCC HOLDINGS, LLC, a Delaware



1   limited liability company; LENNAR
    HOMES OF CALIFORNIA, INC., a
2   California corporation; STUART A.
    MILLER, an individual; JONATHAN M.
3   JAFFE, an individual; RICHARD
    BECKWITT, an individual; HCC
4   INVESTORS LLC, a Delaware limited
    liability corporation; and DOES 1-100,

5
                    Defendants.
6
    -and-
7
    KRMW REAL ESTATE INVESTMENT
8   GROUP, LLC, a California limited liability
    company,
9

10                  Nominal Defendant.

11      **TO THE CLERK OF THE ABOVE-TITLED COURT:**

12      **PLEASE TAKE NOTICE** that defendants Lennar Land Partners II, LLP II HCC

13  Holdings, LLC, Lennar Homes of California, Inc., Lennar Corporation, Stuart A. Miller,

14  Jonathan M. Jaffe, Richard Beckwitt (collectively, "Lennar Defendants"), and HCC

15  Investors LLC ("HCC") hereby remove *Briarwood Capital, LLC, et al. v. KBR Group,*

16  *LLC, et al.*, Case No. 37-2009-00100835-CU-BC-CTL (Hon. Timothy Taylor) (the "State

17  Court Action"), from the Superior Court of the State of California in and for the County of

18  San Diego, to the United States District Court for the Southern District of California.

19  Pursuant to 28 U.S.C. section 1331, the United States District Court for the Southern

20  District of California has original federal question jurisdiction over plaintiffs' cause of

21  action for violation of the Racketeering Influenced and Corrupt Organization Act under 18

22  U.S.C. section 1962(c), and supplemental jurisdiction over the remaining causes of action

23  in plaintiffs' complaint under 28 U.S.C. section 1367(a). All other defendants in this

24  matter join in this Notice of Removal.

25                  <u>**DESCRIPTION OF ACTION**</u>

26      1.      On October 26, 2009, plaintiffs filed their complaint in the State Court

27  Action (the "Complaint"). A true and correct copy of the Complaint is attached hereto as

28

1    Exhibit A.  True and correct copies of all other documents filed by plaintiffs in the State

2    Court Action are attached hereto as Exhibit B.

3    ## SERVICE AND TIMELY REMOVAL

4        2.       No defendant in the State Court Action was served sooner than October 28,

5    2009, when plaintiffs served HCC's registered agent with a summons and copy of the

6    Complaint—making HCC the first defendant served in the State Court Action.  Plaintiffs

7    also separately provided counsel for the Lennar Defendants with summons for each of the

8    Lennar Defendants, as well as copies of the Complaint, Notice of Related Cases, Notice of

9    Case Assignment, Notice to Litigants/ADR Information Package, Stipulation to

10    Alternative Dispute Resolution Process, and a Notice and Acknowledgment of Receipt for

11    each Lennar Defendant.  Pursuant to California Code of Civil Procedure section

12    415.30(d), counsel for the Lennar Defendants accepted service as to those defendants on

13    November 16, 2009 by returning to plaintiffs executed copies of the Notice and

14    Acknowledgement of Receipt for each Lennar Defendant.  The Lennar Defendants and

15    HCC are informed and believe that counsel for the remaining defendants—KBR Group,

16    LLC, KBR Opportunity Fund I, L.P., KBR Opportunity Fund II, L.P., Shawn R.

17    Wamstad, Michel Kucinski, and Randy Rivera (collectively, "KBR Defendants")—

18    accepted service as to those defendants on November 16, 2009 by also returning to

19    plaintiffs executed copies of Notice and Acknowledgement of Receipts for each of the

20    KBR Defendants.

21        3.       This Notice of Removal is timely.  According to 28 U.S.C. section 1446(b),

22    notice of removal must be filed within 30 days after service of the complaint.  The 30 day

23    time frame commences the day after service.  FED. R. CIV. P. 6(a)(1).  Here, the 30 day

24    period commenced on October 29, 2009—the day after plaintiffs served the first

25    defendant with the Complaint—and ends on November 30, 2009.[1]  The Notice of

26    ---
[1] 30 days from October 29, 2009 is November 27, 2009, which is an official holiday.  *See*
FED. R. CIV. P. 6(a)(4); General Order 510.  Accordingly, the deadline for filing the

27    Notice of Removal "runs until the end of the next day that is not a Saturday, Sunday, legal
holiday, or day when the clerk's office is inaccessible," or November 30, 2009.  *See* FED.

28    R. CIV. P. 6(a)(3).

                    NOTICE OF REMOVAL

1   Removal was thus filed within the allotted time frame.

2   <div align="center">**APPEARANCES IN STATE COURT**</div>

3       4.    As of the date of filing of this Notice, neither the Lennar Defendants nor

4   HCC has made any appearance in the State Court Action.

5   <div align="center">**JURISDICTION AND BASIS FOR REMOVAL**</div>

6       5.    This Court has original jurisdiction of the State Court Action under 28

7   U.S.C. section 1331, such that it may be removed to this Court pursuant to the provisions

8   of 28 U.S.C. section 1441(b). Plaintiffs' 17th cause of action arises under the

9   Racketeering Influenced And Corrupt Organization Act (RICO), 18 U.S.C. section

10   1962(c). Original jurisdiction over this claim exists in this Court. *See Emrich v. Touche*

11   *Ross & Co.*, 846 F.2d 1190, 1195-96 (9th Cir. 1988) (explaining "although a RICO action

12   may now, in light of *Lou*, be filed either in federal or state court, the claim itself both

13   arises under and is governed by a comprehensive federal enforcement scheme, even

14   though the predicate offenses underlying the RICO violation may encompass violations of

15   both state and federal criminal law.").

16       6.    Pursuant to 28 U.S.C. section 1367(a), this Court has supplemental

17   jurisdiction over plaintiffs' remaining causes of action since all arise out of the same

18   common nucleus of facts and conduct alleged in the Complaint as the RICO claim. As

19   such, all causes of action alleged in the Complaint are properly tried in one action in this

20   Court. *See Bahrampour v. Lampert*, 356 F.3d 969, 978 (9th Cir. 2004) ("A state law

21   claim is part of the same case or controversy when it shares a 'common nucleus of

22   operative fact' with the federal claims and the state and federal claims would normally be

23   tried together.").

24   <div align="center">**JOINDER OF CO-DEFENDANTS**</div>

25       7.    The KBR Defendants join in this Notice of Removal, as evidenced by the

26   joinder filed concurrently herewith. Although the Complaint identifies 100 unknown

27   "Does" as defendants, for purposes of removal such unknown defendants are not required

28   to join in this Notice of Removal. *See Fristoe v. Reynolds Metals Co.*, 615 F.2d 1209,

      NOTICE OF REMOVAL

1213 (9th Cir. 1980). Nor is nominal defendant KRMW Real Estate Investment Group, LLC required to join in this Notice of Removal. *See Emrich*, 846 F.2d at 1193 n.1; *Hewitt v. City of Stanton*, 798 F.2d 1230, 1232-33 (9th Cir. 1986).

### NOTICE TO STATE COURT AND PLAINTIFFS

8.    Pursuant to 28 U.S.C. section 1446(d), the Lennar Defendants and HCC will promptly file a copy of this Notice of Removal with the Clerk of the Superior Court for the State of California, County of San Diego, in the State Court Action. In addition, the Lennar Defendants and HCC will serve a copy of this Notice of Removal upon plaintiffs.

### PROPER VENUE

9.    The State Court Action may be removed to this Federal District Court, being the United States District Court for the Southern District of California, which embraces San Diego County within its jurisdiction. 28 U.S.C. §§ 84(d), 1446(a).

**WHEREFORE**, the Lennar Defendants and HCC hereby remove the State Court Action to this Court.


Dated: November 30, 2009          O'MELVENY & MYERS LLP


By:_____
          Daniel M. Petrocelli
Attorneys for Defendants Lennar Land
Partners II, LLP II HCC Holdings, LLC,
Lennar Homes of California, Inc., Lennar
Corporation, Stuart A. Miller, Jonathan M.
Jaffe, Richard Beckwitt, and HCC
Investors LLC

5                                    NOTICE OF REMOVAL

## INDEX TO EXHIBITS

| **Exhibit** | **Page No.** |
|---|---|
| Exhibit A | 6 - 179 |
| Exhibit B | 180 - 195 |

**EXHIBIT A**

1  Frederic L. Gordon, Esq., SBN 98994
   Rhonda J. Holmes, Esq., SBN 157017
2  Heather T. Flynn, Esq., SBN 212021
   GORDON & HOLMES
3  223 West Date Street
   San Diego, CA 92101
4  Telephone: (619) 696-0444
   Facsimile: (619) 696-1144

5

6  Todd E. Macaluso, Esq., SBN 133009
   MACALUSO & ASSOCIATES
7  2100 Palomar Airport Rd., Ste. 221
   Carlsbad, CA 92011
   Telephone: (760) 448-1133
8  Facsimile: (760) 448-1134

9  Attorneys for Plaintiffs
   BRIARWOOD CAPITAL, LLC, NICOLAS MARSCH III, COLONY PROPERTIES
10 INTERNATIONAL, LLC and COLONY PROPERTIES INTERNATIONAL II, LLC

11         **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12         **COUNTY OF SAN DIEGO, CENTRAL DIVISION**

13 BRIARWOOD CAPITAL, LLC., a          ) Case No. 37-2009-00100835-CU-BC-CTL
   Delaware limited liability company,  )
14 individually and derivatively on behalf of ) **COMPLAINT FOR:**
   KRMW REAL ESTATE INVESTMENT         )
15 GROUP, LLC; and NICOLAS MARSCH      ) **(1)  BREACH OF THE IMPLIED**
   III, an individual; COLONY PROPERTIES )      **COVENANT OF GOOD FAITH**
16 INTERNATIONAL, LLC, a California     )      **AND FAIR DEALING**
   limited liability company; and COLONY ) **(2)  CONSPIRACY TO BREACH THE**
17 PROPERTIES INTERNATIONAL II, a      )      **IMPLIED COVENANT OF GOOD**
   California limited liability company, )      **FAITH AND FAIR DEALING**
18                                       ) **(3)  BREACH OF CONTRACT**
                Plaintiffs,              ) **(4)  ANTICIPATORY BREACH OF**
19                                       )      **CONTRACT**
   vs.                                   ) **(5)  BREACH OF DUTY OF**
20                                       )      **CONFIDENTIALITY**
   KBR GROUP, LLC, a California limited  ) **(6)  DECLARATORY RELIEF - ALTER**
21 liability company; KBR OPPORTUNITY   )      **EGO**
   FUND I, L.P., a California limited    ) **(7)  DECLARATORY RELIEF -**
22 partnership; KBR OPPORTUNITY FUND    )      **OPERATING AGREEMENT**
   II, L.P., a California limited partnership; ) **(8)  DECLARATORY RELIEF - TERM**
23 SHAWN R. WAMSTAD, an individual;     )      **LOAN AGREEMENT**
   MICHEL KUCINSKI, an individual;      ) **(9)  RESCISSION**
24 RANDY RIVERA, an individual; LENNAR  ) **(10) INJUNCTIVE RELIEF**
   CORPORATION, a Delaware corporation; ) **(11) INTENTIONAL INTERFERENCE**
25 LENNAR LAND PARTNERS II, a Florida   )      **WITH CONTRACT**
   general partnership; LLP II HCC       ) **(12) NEGLIGENT INTERFERENCE**
26 HOLDINGS, LLC, a Delaware limited    )      **WITH CONTRACT**
   liability company; LENNAR HOMES OF   ) **(13) CONSPIRACY TO INTERFERE**
27 CALIFORNIA, INC., a California        )      **WITH CONTRACT**
   corporation; STUART A. MILLER, an    ) **(14) INTENTIONAL INTERFERENCE**
28 individual; JONATHAN M. JAFFE, an    )      **WITH PROSPECTIVE ECONOMIC**

@PFDesktop\::ODMA/PCDOCS/GH/25734/1                    - 1 -
COMPLAINT

Todd E. Macaluso, Esq., SBN 133009

FILED
CIVIL BUSINESS OFFICE 13
CENTRAL DIVISION

2009 OCT 26  P 2: 05

SUPERIOR COURT
SAN DIEGO COUNTY, CA

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444  Fax (619) 696-1144

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444  Fax (619) 696-1144

| | |
|---|---|
| individual; RICHARD BECKWITT, an individual; HCC INVESTORS LLC, a Delaware limited liability corporation; and DOES 1-100, | **ADVANTAGE**<br>**(15) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br>**(16) CONSPIRACY TO INTERFERE WITH PROSPECTIVE ECONOMIC ADVANTAGE** |
| Defendants, | **(17) VIOLATION OF RACKETEER AND CORRUPT ORGANIZATION ACT, 18 U.S.C. §1962(e)** |
| -and- | |
| KRMW REAL ESTATE INVESTMENT GROUP, LLC, a California limited liability company, | **(18) VIOLATION OF BUSINESS & PROFESSIONS CODE §17200 et. seq.** |
| Nominal Defendant. | **(19) BREACH OF CONTRACT**<br>**(20) BREACH OF CONTRACT**<br>**(21) BREACH OF FIDUCIARY DUTY** |

Plaintiffs hereby allege as follows:

## THE PARTIES

1.      Plaintiff BRIARWOOD CAPITAL, LLC ("BRIARWOOD"), is a Delaware limited liability company qualified to do business in the State of California and maintaining its principal place of business in the County of San Diego. BRIARWOOD is primarily engaged in the business of real estate development, including the development of master-planned communities. BRIARWOOD is wholly-owned by plaintiff NICOLAS MARSCH III. BRIARWOOD currently is a member of KRMW REAL ESTATE INVESTMENT GROUP, LLC ("KRMW"), which membership BRIARWOOD acquired when KRMW was first created on or about October 9, 2008.

2.      Plaintiff NICOLAS MARSCH III ("MARSCH") is an individual who resided, at all relevant times, in La Jolla, California.

3.      Plaintiff COLONY PROPERTIES INTERNATIONAL, LLC ("Colony I") is a California limited liability company qualified to do business in the State of California and maintaining its principal place of business in the County of San Diego. Colony I is wholly-owned by plaintiff MARSCH.

4.      Plaintiff COLONY PROPERTIES INTERNATIONAL II, LLC ("Colony II") is a California limited liability company qualified to do business in the State of California and

1    maintaining its principal place of business in the County of San Diego. Colony II is wholly-

2    owned by plaintiff MARSCH.

3        5.    Nominal Defendant KRMW is a California limited liability company doing

4    business in the State of California and is, and at all times herein mentioned was, qualified to do

5    business in the State of California.

6        6.    Defendant KBR GROUP, LLC ("KBR GROUP") is a California limited liability

7    company, which at all times mentioned was qualified to do business and was doing business in

8    the State of California. KBR GROUP is headquartered in the County of San Diego.

9        7.    Defendant KBR OPPORTUNITY FUND 1, L.P. ("KBR FUND I") is a California

10    limited partnership, which at all times mentioned was qualified to do business and was doing

11    business in the State of California. Plaintiffs are informed and believe and thereon allege that

12    KBR FUND 1 is a wholly-owned subsidiary of KBR GROUP.

13        8.    Defendant KBR OPPORTUNITY FUND II, L.P. ("KBR FUND II") is a California

14    limited partnership, which at all times mentioned was qualified to do business and was doing

15    business in the State of California. Plaintiffs are informed and believe and thereon allege that

16    KBR FUND II is a wholly-owned subsidiary of KBR GROUP.

17        9.    Plaintiffs are informed and believe and thereon allege that defendant SHAWN R.

18    WAMSTAD ("WAMSTAD") is an individual who, at all relevant times resided in San Diego

19    County, California. Plaintiffs are further informed and believe that defendant WAMSTAD is a

20    principal in, and Senior Vice President/General Counsel for, defendant KBR GROUP.

21        10.   Plaintiffs are informed and believe and thereon allege that defendant MICHEL

22    KUCINSKI ("KUCINSKI") is an individual who, at all relevant times resided in San Diego

23    County, California. Plaintiffs are further informed and believe that defendant KUCINSKI is a

24    principal in, and Chairman and President of, defendant KBR GROUP.

25        11.   Plaintiffs are informed and believe and thereon allege that defendant RANDY

26    RIVERA ("RIVERA") is an individual who, at all relevant times resided in San Diego County,

27    California. Plaintiffs are further informed and believe that defendant RIVERA is a principal in,

28    and Chief Operating Officer of, defendant KBR GROUP.

GORDON & HOLMES
223 West Date Street San Diego, CA   92101
(619) 696-0444   Fax (619) 696-1144

12.    Plaintiffs are informed and believe and thereon allege that defendants KBR GROUP, KBR FUND I, KBR FUND II, WAMSTAD, KUCINSKI and RIVERA conducted their affairs and business in such a way as to create a unity of interest and ownership, causing each to be the alter ego of the other. KBR GROUP, KBR FUND I, KBR FUND II, WAMSTAD, KUCINSKI and RIVERA are sometimes referred to collectively hereinafter as "KBR."

13.    Defendant LENNAR CORPORATION is a Delaware corporation headquartered in Miami, Florida, which at all relevant times was doing business in the County of San Diego, State of California and was qualified to do business in the State of California.

14.    Defendant LENNAR LAND PARTNERS II ("LLP II") is a Florida general partnership, which at all relevant times was doing business in the County of San Diego, State of California and was qualified to do business in the State of California.

15.    Defendant LENNAR HOMES OF CALIFORNIA, INC. ("LENNAR HOMES") is a California corporation doing business in the State of California and is, and at all times herein mentioned was, qualified to do business in the State of California.

16.    Defendant LLP II HCC HOLDINGS, LLC ("HCC HOLDINGS") is a Delaware limited liability company doing business in the State of California and is, and at all relevant times herein mentioned was, qualified to do business in the State of California. Plaintiff is informed and believes and thereon alleges that HCC HOLDINGS was formed on or about March 5, 2008 as a wholly-owned subsidiary of LLP II.

17.    Defendants LENNAR CORPORATION, LLP II, LENNAR HOMES and HCC HOLDINGS conducted their affairs and business in such a way as to create a unity of interest and ownership, causing each to be the alter ego of the other. LENNAR CORPORATION, LLP II, LENNAR HOMES and HCC HOLDINGS are referred to collectively hereinafter as "LENNAR."

18.    Plaintiffs are informed and believe and thereon allege that defendant STUART A. MILLER is an individual who resides in the State of Florida and at all relevant times was the President and Chief Executive Officer of defendant LENNAR CORPORATION. Plaintiffs are further informed and believe that defendant MILLER is subject to personal jurisdiction in the

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444 Fax (619) 696-1144

1  State of California because he has sufficient continuous and systematic contacts with the

2  jurisdiction. Alternatively, defendant MILLER has purposely established contacts with this state

3  which arise out of and are related to the causes of action pled against him herein, such that

4  California's exercise of personal jurisdiction over him with respect to this action would comport

5  with fair play and substantial justice.

6       19.    Plaintiffs are informed and believe and thereon allege that defendant RICHARD

7  BECKWITT is an individual who resides in the State of Florida and at all relevant times was the

8  Executive Vice President of defendant LENNAR CORPORATION. Plaintiffs are further

9  informed and believe that defendant BECKWITT is subject to personal jurisdiction in the State

10  of California because he has sufficient continuous and systematic contacts with the jurisdiction.

11  Alternatively, defendant BECKWITT has purposely established contacts with this state which

12  arise out of and are related to the causes of action pled against him herein, such that California's

13  exercise of personal jurisdiction over him with respect to this action would comport with fair

14  play and substantial justice.

15       20.    Plaintiffs are informed and believe and thereon allege that defendant JONATHAN

16  M. JAFFE is an individual who, at all relevant times resided in Orange County, California.

17  JAFFE at all relevant times was the Chief Operating Officer of defendant LENNAR

18  CORPORATION.

19       21.    Defendant HCC INVESTORS, LLC ("HCC") is a Delaware limited liability

20  company doing business in the State of California and is, and at all times herein mentioned was,

21  qualified to do business in the State of California.

22       22.    Plaintiffs are unaware of the true names and capacities of defendants sued herein as

23  DOES 1 through 100, and therefore sue these Defendants by such fictitious names. Plaintiffs will

24  amend this complaint to allege their true names and capacities when ascertained. Plaintiffs are

25  informed and believe and thereon allege that each of the fictitiously named DOE defendants is

26  responsible in some manner for the allegations herein.

27       23.    Plaintiffs are informed and believe and thereon allege that at all relevant times each

28  defendant acted as the agent, servant, representative, partner, joint-venturer, co-conspirator

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444 Fax (619) 696-1144

1  and/or employee of the other defendants and, in doing the things hereinafter alleged was acting

2  within the scope of such agency, conspiracy or employment and with the knowledge, permission

3  and consent of each other defendant.

4  ### PLAINTIFF'S RELATIONSHIP WITH LENNAR

5      24.    In or about August 1997, plaintiff MARSCH and Lennar San Jose Holdings, Inc.

6  ("LSJH") (an affiliate of Defendant LENNAR CORPORATION) formed HCC as a Delaware

7  limited company for the purpose of holding title to, and further developing, a 540-acre parcel

8  located in Rancho Santa Fe, San Diego County, California, and commonly known as "The

9  Bridges." A true and correct copy of the Limited Liability Company Agreement of HCC

10  Investors, LLC ("HCC Operating Agreement") is attached hereto as Exhibit 1.

11      25.    At the time of HCC's formation, plaintiff MARSCH and LSJH were the sole

12  members of HCC and held separate 50% interests in HCC. The LSJH interest in HCC has since

13  been repeatedly assigned to various other entities affiliated with defendant LENNAR

14  CORPORATION, including defendants LLP II and HCC HOLDINGS.

15      26.    Plaintiff MARSCH has also transferred his original interest in HCC. On or about

16  May 13, 1998, MARSCH assigned his 50% interest in HCC to plaintiff BRIARWOOD.

17      27.    At all times, pursuant to the terms of the parties' agreements, LENNAR (including,

18  specifically, defendant LENNAR HOMES) has served as the Manager and Project Manager of

19  HCC.

20      28.    The Bridges property was purchased by HCC in February 1998 for $52 million.

21  The purchase was made possible due to MARSCH's years of dedication to his vision of an

22  exclusive residential community and country club at the property. In fact, MARSCH had first

23  obtained title to the property more than 20 years ago.

24      29.    The Bridges property has been developed into an exclusive residential community

25  and private country club which LENNAR describes as an "extraordinary community"

26  surrounding "one of America's great private golf clubs." The homes have won major design

27  awards including the Grand Award, Best Single Family Detached Home, and Residential

28

GORDON & HOLMES
223 West Date Street San Diego, CA  92101
(619) 696-0444 · Fax (619) 696-1144

1  Detached Project of the Year at the 2004 Gold Nugget Awards as well as the Building Industry

2  Association of San Diego's award for Best Detached Housing Product $1,500,001 and over.

3      30.      The private golf course, designed by the Robert Trent Jones II Group, has been

4  equally successful. In 2003, 2004 and 2005, The Bridges hosted the *Battle at the Bridges*, a

5  nationally televised, prestigious best ball team match featuring players such as Tiger Woods,

6  John Daly, and Phil Mickelson.

7      31.      The tremendous market success of The Bridges created a unique opportunity for

8  BRIARWOOD and LENNAR's affiliates to capitalize on the goodwill developed by the market

9  success of The Bridges project by working together on other potential master-planned

10  communities in the Rancho Santa Fe area. BRIARWOOD and LENNAR therefore jointly

11  acquired, through an entity known as Lennar Bridges, LLC ("Lennar Bridges"), an adjacent

12  parcel of approximately 80 net acres, initially known as Santa Fe Creek, which was ultimately

13  incorporated into The Bridges development. BRIARWOOD and LENNAR developed the Santa

14  Fe Creek site into 40 building sites, including 32 examples of the award-winning Cortile

15  Collection of homes with finished prices of approximately $3 million per home.

16      32.      In addition, the parties pursued another nearby property, commonly known as

17  McCrink Ranch, which consisted of approximately 542 developable acres. The McCrink family

18  had controlled the property for approximately 30 years and had worked to obtain government

19  entitlements in order to allow the McCrink Ranch property to be developed into a high-end

20  master-planned residential community.

21      33.      Commencing before 1998, MARSCH had begun to actively pursue the acquisition

22  of the McCrink Ranch property. BRIARWOOD and MARSCH recognized the McCrink Ranch

23  project could benefit from the "halo effect" of the market success of The Bridges if it could be

24  marketed as being "brought to you by the builders of The Bridges." For this reason and others,

25  including strong feelings of trust and loyalty established during The Bridges development

26  process, BRIARWOOD determined to invite LENNAR to jointly pursue the McCrink Ranch

27  development opportunity in partnership with BRIARWOOD.

28

GORDON & HOLMES
223 West Date Street San Diego, CA  92101
(619) 696-0444  Fax (619) 696-1144

34.     LENNAR agreed to pursue the McCrink Ranch real estate development opportunity jointly with BRIARWOOD. From 1998 through early 2006, plaintiff BRIARWOOD expended considerable services, including time, effort and funds, in furtherance of the parties' anticipated purchase of McCrink Ranch. Notwithstanding these efforts, LENNAR's long-standing fiduciary relationship with BRIARWOOD, and the express agreement to jointly pursue the property with BRIARWOOD, LENNAR joined with another entity to squeeze out BRIARWOOD and usurp from it the McCrink Ranch opportunity.

35.     Meanwhile, despite the accomplishments of The Bridges, LENNAR was reporting a substantial negative net cash flow in project accountings, allegedly due to increased project costs, all of which are controlled by LENNAR. In fact, an accounting provided by LENNAR in late 2007 (after BRIARWOOD had filed suit, as alleged below) demonstrated continued unjustifiable increases in costs and consequent reductions to net cash flow. The result is that LENNAR projects zero profits to BRIARWOOD for its 50% membership interest and substantial contributions to HCC, despite over $500 million in revenues.

### THE LENNAR LITIGATION

36.     As a result of LENNAR's actions with respect to The Bridges and McCrink Ranch, in late 2006, BRIARWOOD instituted two lawsuits against LENNAR in San Diego Superior Court. Initially, on November 13, 2006, BRIARWOOD filed *Briarwood Capital, LLC v. Lennar Homes of California, Inc., et al.*, Case No. GIC 875457 (the "McCrink Ranch Action"), for the purpose of recovering losses associated with LENNAR's usurption of the McCrink Ranch opportunity. On December 22, 2006, BRIARWOOD filed *Briarwood Capital, LLC v. Lennar Land Partners II, et al.*, Case No. GIC 877446 (the "Bridges Action"), to recover damages caused by LENNAR's mismanagement (or worse) of The Bridges development.

37.     BRIARWOOD's filing of the McCrink Ranch Action and the Bridges Action spawned additional litigation between the parties. Specifically, LENNAR filed *Lennar Homes of California, Inc. v. DLA Piper US LLP, et al.*, Case No. 37-2008-00076811, on January 28, 2008, and *Lennar Homes of California, Inc. v. DLA Piper US LLP, et al.*, Case No. 37-2008-00092842, on September 30, 2008. MARSCH was named as an individual in both actions, which allege that,

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444 Fax (619) 696-1144

with respect to The Bridges and McCrink Ranch, MARSCH improperly interfered with LENNAR's relationship with its counsel and aided and abetted that counsel's breach of duty to LENNAR. In addition, LENNAR initiated a Florida lawsuit relating to these same facts. In *Lennar v. Briarwood Capital, LLC and Nicolas Marsch, III*, Case No. 08-55741 CA 10, filed in the Circuit Court of the 11th Judicial Circuit In and For Miami-Dade County, Florida, LENNAR alleges threatening, extortionate and wrongful conduct in connection with the Bridges and McCrink residential communities and intentional interference with LENNAR's business.

38.    The five lawsuits discussed in the above paragraphs are hereafter collectively referred to as the "Lennar litigation."

39.    After the Lennar litigation was commenced, LENNAR took actions purposefully designed to deprive plaintiffs of the capital necessary to fund both the Lennar litigation and plaintiffs' other development opportunities. Specifically, pursuant to Section 6.05 of the HCC Operating Agreement, BRIARWOOD is to receive certain fees from HCC, which are in addition to any net cash flow otherwise owed. These fees include: (1) an annual management fee of $250,000 and an annual overhead fee of $60,000, both subject to a cost of living adjustment; (2) an override fee of 3 ½% of gross sales of all products within the project; and (3) one-half of the resale transfer fee payable to HCC upon resales of properties located within the project.

40.    These fees are accorded a protected status under the HCC Operating Agreement. For instance, the HCC Operating Agreement provides that the override fee "shall not be subject to offsets, deductions, or adjustments of any kind." In fact, plaintiff MARSCH negotiated the HCC Operating Agreement with LENNAR and obtained such protective provisions for the express purpose of ensuring that he would receive the payments due him regardless of any other circumstance.

41.    For over nine years, LENNAR honored its obligation to cause HCC to make these payments. At all times since June 2008, however, LENNAR has caused HCC to withhold these payments. LENNAR has not provided any adequate justification for its refusal to provide BRIARWOOD with the fees it is owed under the HCC Operating Agreement.

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444 Fax (619) 696-1144

EXHIBIT A
Page 14

**THE RELATIONSHIP BETWEEN KBR AND BRIARWOOD, MARSCH AND COLONY**

42.     The cost of the Lennar litigation, combined with LENNAR wrongfully having withheld millions of dollars in fees, distributions and capital that were due to BRIARWOOD, had caused plaintiffs BRIARWOOD, MARSCH, COLONY I and COLONY II significant cash flow problems.

43.     In or about April 2008, plaintiffs BRIARWOOD and MARSCH held discussions with Cove Partners, LLC, for the purpose of having Cove Partners assist plaintiffs in finding financing for a development in San Jacinto, California. On or about May 10, 2008, plaintiffs formally engaged Cove Partners, whose role was expanded to include assisting plaintiffs with their broader need for capital, including funding for the Lennar litigation.

44.     Cove Partners thereafter approached, among others, defendant KBR concerning the San Jacinto development. While a transaction with respect to San Jacinto was never consummated, Cove Partners also began discussing with KBR, in or about June 2008, the possibility of KBR extending a loan to plaintiffs to assist plaintiffs with their overall liquidity needs, including funding for the Lennar litigation.

45.     Such discussions were productive. On or about June 24, 2008, the parties executed a loan agreement. The agreement called for defendant KBR FUND I to loan the principle sum of $4,900,000 jointly to plaintiffs COLONY I and COLONY II. The loan (hereafter the "Colony Loan") was secured by the borrowers' rights to certain properties in Mexico and provided a right of first refusal to KBR to participate in the Lennar litigation. A true and correct copy of the June 24, 2008 Term Loan Agreement is attached hereto as Exhibit 2.

46.     Plaintiffs thereafter determined that the Colony Loan would not be sufficient to satisfy plaintiffs' ongoing liquidity needs, particularly in light of the substantial costs associated with the Lennar litigation. Therefore, in or about July 2008, plaintiffs and KBR, pursuant to KBR's right of first refusal to participate in the Lennar litigation, opened negotiations concerning KBR's potential investment in the Lennar litigation.

47.     As a result of those negotiations, on or about November 5, 2008, plaintiffs and defendant KBR entered into an operating agreement, by which nominal defendant KRMW was

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444  Fax (619) 696-1144

1    formed ("Operating Agreement"). A true and correct copy of the November 5, 2008 Operating

2    Agreement is attached hereto as Exhibit 3.

3        48.      Pursuant to the terms of the Operating Agreement, each party was required to make

4    certain contributions to KRMW. Specifically, plaintiffs BRIARWOOD and MARSCH agreed to

5    contribute to KRMW (a) all proceeds from their claims against LENNAR in both the Bridges

6    Action and the McCrink Ranch Action; (b) their ownership interest in both HCC and Lennar

7    Bridges (except for certain specifically defined "Retained Benefits"), and (c) an assumption of

8    the obligation to pay litigation costs associated with the Lennar litigation. Defendant KBR

9    FUND II was obligated to loan up to $4,190,000 in cash, with the sum of $3,000,000 to be

10    immediately contributed.

11        49.      Consistent with these obligations, the parties executed, on November 5, 2008,

12    several assignments, as follows:

13          (a)     Assignment of Claims (assigning the Lennar litigation claims to KRMW)

14               (attached hereto as Exhibit 4);

15          (b)     Assignment of Membership Interest (assigning plaintiff BRIARWOOD's

16               interest in HCC to KRMW) (attached hereto as Exhibit 5);

17          (c)     Assignment of Membership Interest (assigning plaintiff MARSCH's interest

18               in HCC to KRMW) (attached hereto as Exhibit 6);

19          (d)     Assignment of Membership Interest (assigning plaintiff BRIARWOOD's

20               interest in Lennar Bridges to KRMW) (attached hereto as Exhibit 7); and

21          (e)     Assignment of Membership Interest (assigning plaintiff MARSCH's interest

22               in Lennar Bridges to KRMW) (attached hereto as Exhibit 8).

23       In addition, the parties executed a Security Agreement, by which plaintiffs' claims in the

24    Bridges Action and the McCrink Ranch Action were pledged as collateral to secure performance

25    of BRIARWOOD's obligations under the Operating Agreement. A true and correct copy of the

26    Security Agreement is attached hereto as Exhibit 9. Defendant KBR made the required

27    $3,000,000 cash contribution on or about November 5, 2008.

28        50.      Although the Operating Agreement required plaintiffs to assign, and plaintiffs did

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444 Fax (619) 696-1144

1   assign, their interests in the Lennar litigation to KRMW, the Assignment of Claims expressly

2   allowed plaintiffs BRIARWOOD and MARSCH to prosecute the Bridges Action and the

3   McCrink Action "in their own name but as agent and nominee of [KRMW]." In addition, Article

4   4 of the Operating Agreement names plaintiff MARSCH as the sole Manager of KRMW and

5   provides him with power to carry out the business of KRMW, including management of the

6   Lennar litigation.

7      51.    On or about November 6, 2008, the day after the Operating Agreement and

8   assignments were executed, plaintiffs MARSCH and BRIARWOOD reached a further letter

9   agreement with KBR ("Letter Agreement"), by which the parties promised to "cooperate together

10   toward the acquisition of the interests in HCC not held by BRIARWOOD for the benefit of

11   KRMW." The November 6, 2008 Letter Agreement further provided "that neither of us will

12   circumvent these efforts to acquire such interests for the benefit of KRMW and will not acquire

13   such interests for either of our own benefit or the benefit of our affiliates to the exclusion of

14   KRMW without the written approval of each of us." A true and correct copy of the November 6,

15   2008 Letter Agreement is attached hereto as Exhibit 10.

16      52.    At all times since the Operating Agreement and the November 6, 2008 Letter

17   Agreement were executed, plaintiffs have complied with all obligations, duties and

18   responsibilities required of them pursuant to these agreements.

19      53.    Further, at various times, plaintiffs, their litigation counsel, and their financial

20   consultants provided KBR with detailed information concerning (a) plaintiff MARSCH's

21   financial condition (and, by extension, the financial condition of the other plaintiffs), and (b)

22   plaintiff's strategies with respect to the Lennar litigation, including attorney-client privileged

23   information.  KBR was under a duty of confidentiality at all times not to share any of this

24   confidential information with any third party.

25             **KBR AND LENNAR CONSPIRE AGAINST PLAINTIFFS**

26      54.    On November 6, 2008, the Hon. William R. Nevitt, Jr. of the San Diego Superior

27   Court granted defendant LENNAR's Motion for Judgment on the Pleadings in the McCrink

28   Ranch Action. Motions for reconsideration and a new trial were denied by Judge Nevitt on or

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444  Fax (619) 696-1144

GORDON & HOLMES
223 West Date Street San Diego, CA    92101
(619) 696-0444   Fax (619) 696-1144

1    about January 16, 2009. Plaintiff BRIARWOOD filed a Notice of Appeal on March 18, 2009.

2    The appeal remains pending as of the filing of this Complaint.

3        55.    On or about January 29, 2009, KBR's counsel sent a letter to plaintiffs' counsel

4    setting forth KBR's belief that, as a result of Judge Nevitt's rulings on LENNAR's Motion for

5    Judgment on the Pleadings (including the denial of the January 16, 2009 motions), the McCrink

6    Ranch Action had been "dismissed." KBR concluded, therefore, that it had obtained a "Put

7    Right" pursuant to Sections 3.1.2.4 and 4.4(2) of the Operating Agreement. Such a "Put Right"

8    arises under Section 3.1.2.4, in part, upon the "Litigation Determination Date." The "Litigation

9    Determination Date," in turn, is defined by Section 4.4(2) to arise when either of the pending

10    actions against Lennar are "dismissed." Defendant KBR adopted this position despite the fact

11    that it was aware that BRIARWOOD intended to appeal Judge Nevitt's decision. Although

12    KBR's January 29, 2009 letter set forth it purported right to exercise its Put Right, KBR

13    indicated that it was not exercising such rights.

14        56.    Plaintiffs are informed and believe and thereon allege that, at some time after KBR

15    Group sent its January 29, 2009 letter, defendants LENNAR, MILLER, JAFFE, BECKWITT,

16    WAMSTAD, KUCINSKI and RIVERA began conspiring to deprive plaintiffs of their rights and

17    interest arising in or out of HCC, Lennar Bridges, the Lennar Litigation, the Colony Loan and the

18    KRMW Operating Agreement. The conspiracy began after LENNAR misused discovery

19    obtained in the Lennar litigation, including documents and other discovery obtained from Cove

20    Partners, to locate and pursue a relationship with KBR and its principals.

21        57.    Consistent with defendants' plot, on or about March 25, 2009, after the Notice of

22    Appeal in the McCrink Action had been filed, KBR served plaintiffs with a certified letter, which

23    purported to provide "formal notice" that KBR was electing to exercise its Put Right. KBR

24    thereby demanded payment of $4,734,000, the first installment of which was said to be due

25    within sixty days. The purported right to exercise the Put Right was stated to be on the same

26    basis as had been set forth in the January 29, 2009 letter discussed above, i.e., the McCrink

27    Ranch Action had been "dismissed" as a result of Judge Nevitt's actions. Plaintiffs are informed

28    and believe and thereon allege that KBR Group sent the March 25, 2009 letter with the

1  cooperation of, and at the direction of, defendants LENNAR, MILLER, JAFFE, BECKWITT,

2  WAMSTAD, KUCINSKI and RIVERA.

3      58.    Plaintiffs are informed and believe that defendants LENNAR, MILLER, JAFFE,

4  BECKWITT, WAMSTAD, KUCINSKI and RIVERA were aware, at the time the March 25,

5  2009 letter was sent to plaintiffs, that a Notice of Appeal had been filed in the McCrink Action

6  and that the case therefore had not been "dismissed" so as to give rise to any Put Right. Nor was

7  there any other basis for KBR Group to exercise its Put Right. Plaintiffs are further informed and

8  believe and thereon allege that the actions of defendants LENNAR, MILLER, JAFFE,

9  BECKWITT, WAMSTAD, KUCINSKI and RIVERA with respect to the letter were therefore in

10  bad faith and were in fact intentionally designed to interfere with plaintiffs' contractual relations

11  with KBR Group and to thereby cause plaintiffs to suffer severe financial hardship.

12      59.    Defendants LENNAR, MILLER, JAFFE, BECKWITT, WAMSTAD, KUCINSKI

13  and RIVERA's involvement with the March 25, 2009 letter was merely the tip of the conspiracy

14  iceberg. Plaintiffs are informed and believe that on or about April 3, 2009, a secret meeting was

15  attended by, among others, defendants MILLER, JAFFE and BECKWITT (each of whom

16  attended in both their individual capacities and as representatives of LENNAR), LENNAR's

17  litigation counsel, Daniel Petrocelli, defendants WAMSTAD, KUCINSKI and RIVERA, and

18  KBR's business counsel, Robert Blanchard. Plaintiffs are informed and believe and thereon

19  allege that during this 8-hour long meeting, KBR, its counsel, LENNAR and LENNAR's counsel

20  further discussed working together to eliminate plaintiffs' rights as to HCC and The Bridges

21  development and to thereby steal 20 years' worth of MARSCH's hard work and hundreds of

22  millions of his hard-earned dollars, to eliminate the collateral which secured the June 24, 2008

23  Term Loan, and to eliminate any and all other benefits which plaintiffs had a result of their

24  contractual relations with KBR. Neither plaintiffs nor their counsel were informed or otherwise

25  aware of the April 3, 2009 meeting until after the meeting had concluded.

26      60.    Plaintiffs are informed and believe and thereon allege that the April 3, 2009

27  meeting was held at the request of attorney Petrocelli, counsel of record for LENNAR in the

28  Lennar litigation, who was acting on behalf of LENNAR, MILLER, JAFFE and BECKWITT.

GORDON & HOLMES
223 West Date Street San Diego, CA  92101
(619) 696-0444    Fax (619) 696-1144

1    Mr. Petrocelli instigated the meeting despite the fact that he was aware (a) KBR owned an

2    interest in KRMW, (b) KRMW, as assignee of BRIARWOOD's claims, had an in interest in the

3    Lennar litigation, and (c) KBR was therefore jointly represented by plaintiffs' litigation counsel.

4         61.     Plaintiffs are further informed and believe and thereon allege that, during the April

5    3, 2008 meeting and at various times thereafter, defendants KBR, WAMSTAD, KUCINSKI and

6    RIVERA, along with their counsel Mr. Blanchard, shared with LENNAR, MILLER, JAFFE,

7    BECKWITT, and LENNAR's counsel a substantial amount of private, confidential, privileged

8    and otherwise protected information concerning, among other things, plaintiffs' financial

9    circumstances and plaintiffs' litigation strategy in the Lennar litigation. Such information had

10   been shared by plaintiffs with KBR, its principals, and its counsel solely as a result of KBR's

11   confidential relationship to plaintiffs in connection with the Colony Loans, the establishment of

12   KRMW and the assignments executed in connection therewith, and KRMW's interest in the

13   Lennar litigation. Plaintiffs are informed and believe that defendants have subsequently used

14   such confidential and privileged for their own personal and improper gain. Plaintiffs are further

15   informed and believe that LENNAR's counsel, Mr. Petrocelli, has used the confidential and

16   privileged information illicitly obtained from KBR, WAMSTAD, KUCINSKI and RIVERA to

17   directly benefit LENNAR in the Lennar litigation.

18        62.     Also during the April 3, 2009 meeting, defendants KBR, LENNAR, MILLER,

19   JAFFE, BECKWITT, KBR, WAMSTAD, KUCINSKI and RIVERA (and their respective

20   counsel, Mr. Petrocelli and Mr. Blanchard) discussed a secret deal designed to both enhance

21   KBR's position with respect to The Bridges development and to protect LENNAR from the

22   exposure it faced in the Lennar litigation. Specifically, defendants developed a scheme which

23   would (a) result in KBR obtaining a 10% in the Bridges development for itself, (b) require

24   MARSCH and BRIARWOOD to relinquish all of their interest in HCC, The Bridges

25   development, and the Lennar litigation, and (c) relieve LENNAR from any further liability to

26   MARSCH or BRIARWOOD. The plot was further designed to deprive plaintiffs of all future

27   benefits of the Colony Loans, the KRMW Operating Agreement, and related agreements between

28

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444 Fax (619) 696-1144

1    plaintiffs and KBR. Immediately after this secret meeting, defendant KUCINSKI contacted

2    plaintiff MARSCH by telephone to set up a meeting for the following day.

3        63.    MARSCH met with defendant KUCINSKI on or about April 4, 2009, at which time

4    KUCINSKI explained the self-serving arrangement that had been agreed to by defendants the

5    prior day, as alleged in paragraph 62 above. During the meeting, defendant KUCINSKI, who

6    was aware that plaintiffs were continuing to incur substantial costs in the prosecution and defense

7    of the Lennar litigation, pressured BRIARWOOD and MARSCH to accept the deal, threatening

8    that if plaintiffs did not do so, KUCINSKI would cause KBR to "act to protect its interests."

9    Nevertheless, plaintiffs did not accept and have not accepted the deal. Plaintiffs are informed and

10   believe and thereon allege that the actions of defendants with respect to the proposed transaction

11   as alleged herein were in bad faith and were in fact intentionally designed to interfere with

12   plaintiffs' contractual relations with KBR and to thereby cause plaintiffs to suffer severe

13   financial hardship.

14       64.    In addition to the actions described above, KBR took certain actions with respect to

15   the Colony Loan which constitute a breach of the June 24, 2008 Term Loan Agreement. That

16   agreement, at section 2.5, provides that a "Loan Reserve Amount shall be applied to interest

17   payments" due under the note during the $7_{th}$, $9_{th}$, $11_{th}$ and $12_{th}$ months of the loan term.

18   Accordingly, the interest payment for the month of May 2009 was to be drawn from the Loan

19   Reserve Amount established under the agreement, and need not have been made by the

20   borrowers.

21       65.    Nonetheless, on May 6, 2009, defendant KBR informed plaintiffs that KBR would

22   declare borrowers to be in default of the June 24, 2008 Term Loan Agreement if the May 2009

23   interest payment is not made by the borrowers. Since no such payment was due, no payment was

24   made. On May 20, 2009, defendant KUCINSKI formally served a Notice of Default on plaintiffs.

25   Plaintiffs are informed and believe and allege thereon that the actions of KBR with respect to the

26   Term Loan Agreement were performed with the cooperation of, and at the direction of,

27   defendants LENNAR, MILLER, JAFFE, BECKWITT, WAMSTAD, KUCINSKI and RIVERA.

28   Plaintiffs are further informed and believe that the actions of these defendants with respect to the

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444   Fax (619) 696-1144

1    Term Loan Agreement were in bad faith and were intentionally designed to interfere with

2    plaintiffs' contractual relations with KBR and to thereby cause plaintiffs to suffer severe

3    financial hardship.

4         66.    Plaintiffs are additionally informed and believe, and thereon alleged, that

5    defendants LENNAR, MILLER, JAFFE, BECKWITT, WAMSTAD, KUCINSKI and RIVERA

6    have agreed, in furtherance of their conspiracy, that LENNAR shall continue to withhold

7    payments due to plaintiff BRIARWOOD which are due pursuant to Section 6.05 of the HCC

8    Operating Agreement. By doing so, defendants have intentionally continued to deprive plaintiffs

9    of the capital necessary to prosecute and defend the Lennar litigation, and to otherwise

10   successfully operate plaintiffs' business as a real estate developer.

11        67.    Defendants' actions as alleged herein have in fact deprived plaintiffs of critical

12   capital. As a direct and proximate result, among other damages, plaintiffs were unable to

13   complete the purchase of, and in September 2009 lost the exclusive right to purchase, 515 acres

14   of property in the City of San Jacinto.

15                              **DERIVATIVE CLAIMS**

16        68.    Plaintiffs bring this action on their own behalf as well as derivatively in the right

17   and for the benefit of KRMW to redress injuries suffered, and to be suffered, by KRMW as a

18   direct result of the actions of KBR as alleged herein. Plaintiffs will adequately and fairly

19   represent the interests of KRMW in enforcing and prosecuting its rights. At all times relevant to

20   the wrongful conduct of defendants, BRIARWOOD and/or MARSCH have been members of

21   KRMW.

22        69.    Plaintiffs have not made any demand of KRMW to institute this action because

23   such demand would be a futile, wasteful and useless act, particularly because certain defendants

24   purport to be 65% owners of KRMW and have committed the acts complained of herein. As a

25   result, defendants are not disinterested or independent. Thus, defendants cannot exercise

26   independent objective judgment in deciding whether to bring an action or whether to vigorously

27   prosecute an action because they are interested personally in the outcome, thereby excusing

28   demand.

@PFDesktop\::ODMA/PCDOCS/GH/25734/1          - 17 -
COMPLAINT

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444 Fax (619) 696-1144

**EXHIBIT A**
**Page 22**

**I.**

## FIRST CAUSE OF ACTION

**(Breach of the Implied Covenant of Good Faith and Fair Dealing against KBR and DOES 1-50)**

70.     Plaintiffs incorporate by reference as though set forth herein each and every allegation of paragraphs 1 through 69 above.

71.     There is implied into every contract in California a covenant of good faith and fair dealing, which requires at a minimum that the parties to the June 24, 2008 Term Loan Agreement, the Operating Agreement, and the November 6, 2008 Letter Agreement act in a manner of good faith and deal with one another fairly. The implied covenant of good faith and fair dealing required defendant KBR and DOES 1-50, among other things, to (1) refrain from taking action to interfere with plaintiffs' prosecution of claims in the Lennar litigation, and (2) maintain the confidentiality of plaintiffs' and KRMW's private, confidential and privileged information.

72.     Defendants breached this implied covenant of good faith and fair dealing by the conduct alleged hereinabove. As a proximate result of defendants' conduct and breach, plaintiffs and KRMW have been damaged in an amount not yet ascertained, subject to proof at trial.

**II.**

## SECOND CAUSE OF ACTION

**(Conspiracy to Breach the Implied Covenant of Good Faith and Fair Dealing against KBR and DOES 1-50)**

73.     Plaintiffs incorporate by reference as though set forth herein each and every allegation of paragraphs 1 through 72 above.

74.     Defendants KBR and DOES 1-50, and each of them, were aware that plaintiffs' primary sources of revenue to meet plaintiffs' financial obligations under the June 24, 2008 Term Loan were funds to be received by plaintiffs as a result of their ownership interest in HCC and anticipated funds to be received as a result of the Lennar litigation.

GORDON & HOLMES
223 West Date Street San Diego, CA  92101
(619) 696-0444  Fax (619) 696-1144

75.    Defendants, and each of them, engaged in the formation and operation of a conspiracy designed to deprive plaintiffs of their rightful share of funds from HCC and the Lennar litigation and to enhance defendants' own position vis-a-vis HCC and The Bridges development. Defendants, and each of them, knew and intended that their actions would deprive plaintiffs of such rights, would prevent plaintiffs COLONY I and COLONY II from being able to make monthly interest payments owing under the Term Loan Agreement, and would position defendants to enhance their position in HCC.

76.    In furtherance of the conspiracy, and as alleged in paragraphs 59 through 62 above, defendants, and each of them, reached a secret agreement with LENNAR and LENNAR's counsel, which agreement was designed to enhance defendants' own position, to relieve LENNAR from further exposure with respect to the Lennar litigation, and to terminate plaintiffs' rights with respect to HCC and the Lennar litigation.

77.    The actions of the conspiracy as alleged herein constitute a breach of the implied covenant of good faith and fair dealing under the June 24, 2008 Term Loan Agreement, the Operating Agreement, and the other agreements alleged herein.

78.    As a proximate result of this conspiracy, plaintiffs have been damaged in an amount not yet ascertained, subject to proof at trial.

### III.

### THIRD CAUSE OF ACTION

**(Breach of Contract - Operating and Letter Agreements against KBR and DOES 1-50)**

79.    Plaintiffs incorporate by reference as though set forth herein each and every allegation of paragraphs 1 through 78 above.

80.    Defendants KBR and DOES 1-50 breached the Operating Agreement and November 6, 2008 Letter Agreement by, without limitation, (1) attempting and negotiating to acquire an interest in HCC to the exclusion of plaintiffs and in contravention of the November 6, 2008 Letter Agreement, and (2) by falsely asserting Put Rights and demanding payment pursuant to Section 3.1.2.4 of the Operating Agreement.

GORDON & HOLMES
223 West Date Street San Diego, CA  92101
(619) 696-0444  Fax (619) 696-1144

EXHIBIT A
Page 24

81. Plaintiffs BRIARWOOD and MARSCH have performed all of their obligations under the Operating Agreement and KBR's performance is not otherwise excused.

82. As a proximate result of defendant KBR's material breach of the Operating Agreement and November 6, 2008 Letter Agreement, plaintiffs have been damaged in an amount not yet ascertained, subject to proof at trial.

**IV.**

**FOURTH CAUSE OF ACTION**

**(Breach of Contract - Term Loan Agreement against KBR and DOES 1-50)**

83. Plaintiffs incorporate by reference as though set forth herein each and every allegation of paragraphs 1 through 82 above.

84. Defendants KBR and DOES 1-50 breached the Term Loan Agreement by informing plaintiffs COLONY I and COLONY II that, unless an interest payment was made by COLONY I or COLONY II for the month of May 2009, KBR would consider the borrowers to be in default of the loan agreement, and thereafter declaring such default. In fact, no such payment was due in light of the fact that, pursuant to Section 2.5 of the June 24, 2008 Term Loan Agreement, such payment was to be withdrawn from the Loan Reserve Amount.

85. Plaintiffs COLONY I and COLONY II have performed all of their obligations under the Term Loan Agreement and KBR's performance is not otherwise excused.

86. As a proximate result of defendant KBR's anticipated material breach of the Term Loan Agreement, plaintiffs COLONY I and COLONY II have been damaged in an amount not yet ascertained, subject to proof at trial.

**V.**

**FIFTH CAUSE OF ACTION**

**(Breach of Duty of Confidentiality against KBR and DOES 1-50)**

87. Plaintiffs incorporate by reference as though set forth herein each and every allegation of paragraphs 1 through 86 above.

88. As a result of the Colony Loan, the creation of KRMW, and the Lennar litigation, defendant KBR and DOES 1-50 obtained significant private and privileged information from and

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444 Fax (619) 696-1144

1  about plaintiffs MARSCH and BRIARWOOD. Such information included, without limitation,

2  plaintiffs' private financial information and attorney-client communications concerning

3  plaintiffs' strategies in the Lennar litigation. Such information further included privileged

4  attorney-client information which belonged to KRMW.

5    89.    By virtue of the parties' relationships, defendants owed a duty, including a

6  fiduciary duty, to maintain the confidentiality of all such information.

7    90.    By defendants' actions in sharing the confidential information with LENNAR and

8  its counsel in connection with the April 4, 2009 meeting alleged herein, defendants breached

9  their duty of confidentiality, including all fiduciary duties relating thereto.

10    91.    As a direct and proximate result of such breach, plaintiffs and KRMW have been

11  damaged in an amount not yet ascertained, subject to proof at time of trial.

12    92.    The above-described conduct of defendants KBR and DOES 1-50 was willful and

13  fraudulent, and was intended to cause injury to the plaintiffs. KBR and DOES 1-50 are therefore

14  liable for exemplary or punitive damages.

15                        **VI.**

16                **SIXTH CAUSE OF ACTION**

17    **(For Declaratory Relief – Alter Ego against KBR and DOES 1-20)**

18    93.    Plaintiffs incorporate by reference as though set forth herein each and every

19  allegation of paragraphs 1 through 92 above.

20    94.    Plaintiffs are informed and believe and based thereon allege that defendants

21  WAMSTAD, KUCINSKI and RIVERA dominated, influenced and controlled the business,

22  property and affairs of KBR GROUP, KBR FUND I, KBR FUND II and DOES 1 through 20.

23  Plaintiffs are further informed and believe and based thereon allege that defendant KBR GROUP

24  dominated, influenced and controlled the business, property and affairs of KBR FUND I and

25  KBR FUND II and DOES 1 through 20.

26    95.    Plaintiffs are informed and believe and based thereon allege that at all times

27  mentioned herein there existed and now exists such a unity of interest and ownership between

28  WAMSTAD, KUCINSKI, RIVERA, KBR GROUP, KBR FUND I, KBR FUND II, and DOES 1

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444   Fax (619) 696-1144

through 20 that the claimed individuality and separateness of those individuals and entities no longer exists. Adherence of the fiction that defendants KBR GROUP, KBR FUND I, KBR FUND II, and DOES 1 through 20 are separate entities with legally distinct identities would sanction a fraud and promote injustice.

96.    Plaintiffs are further informed and believe, and based thereon allege, that at all times mentioned herein KBR GROUP, KBR FUND I, KBR FUND II and DOES 1 through 20 have been mere shells which WAMSTAD, KUCINSKI and RIVERA have used, in bad faith, as a conduit for their business, property and affairs. Alternatively, at all times mentioned herein KBR FUND I, KBR FUND II and DOES 1 through 20 have been mere shells which KBR GROUP has used, in bad faith, as a conduit for their business, property and affairs.

97.    If the acts, obligations and liabilities of KBR GROUP, KBR FUND I, KBR FUND II and DOES 1 through 20 are treated as obligations and liabilities separate from those of WAMSTAD, KUCINSKI and RIVERA, an inequitable result will follow. Alternatively, if the acts, obligations and liabilities of KBR FUND I, KBR FUND II and DOES 1 through 20 are treated as obligations and liabilities separate from those of KBR GROUP, an inequitable result will follow.

98.    Plaintiffs are informed and believe, and based thereon allege, that WAMSTAD, KUCINSKI, RIVERA, KBR GROUP, KBR FUND I, KBR FUND II, and DOES 1 through 20 deny that they are alter egos and contend that recognizing their purported separate existences would not sanction a fraud and promote an injustice and that they therefore should be recognized as legally separate entities in a court of law.

99.    Plaintiffs therefore desire a judicial determination that WAMSTAD, KUCINSKI, RIVERA, KBR GROUP, KBR FUND I, KBR FUND II, and DOES 1 through 20 are alter ego entities whose purported separate identities should be disregarded for all purposes.

////

////

////

////

GORDON & HOLMES
223 West Date Street San Diego, CA  92101
(619) 696-0444  Fax (619) 696-1144

GORDON & HOLMES
223 West Date Street San Diego, CA  92101
(619) 696-0444  Fax (619) 696-1144

VII.

## SEVENTH CAUSE OF ACTION

### (Declaratory Relief - Operating Agreement against KBR and DOES 1-50)

100.    Plaintiffs incorporate by reference as though set forth herein each and every allegation of paragraphs 1 through 99 above.

101.    An actual controversy has now arisen between plaintiffs and defendants KBR and DOES 1-50 concerning the parties' respective rights and obligations.

102.    Specifically, defendants maintain that the McCrink Ranch Action has been dismissed pursuant to section 4.4(2) of the KRMW Operating Agreement and that, as a result, defendants have obtained certain Put Rights pursuant to section 3.1.2.4 of the Operating Agreement. Plaintiffs dispute these claims, and instead maintain that (1) the McCrink Ranch Action has not been dismissed because it is pending on appeal, and (2) defendants have therefore not obtained any put rights under section 3.1.2.4.

103.    A judicial declaration resolving this dispute is necessary and appropriate. Specifically, plaintiffs requests that this court declare (1) that the McCrink Ranch Action has not been "dismissed," as that term is used in section 4.4(2) of the Operating Agreement, and (2) that defendants have not obtained any put rights under section 3.1.2.4 of the Operating Agreement.

VIII.

## EIGHTH CAUSE OF ACTION

### (Declaratory Relief - Term Loan Agreement against KBR and DOES 1-50)

104.    Plaintiffs incorporate by reference as though set forth herein each and every allegation of paragraphs 1 through 103 above.

105.    An actual controversy has now arisen between plaintiffs COLONY I and COLONY II, on the one hand, and defendants KBR and DOES 1-50, on the other, concerning the parties' respective rights and obligations with respect to the June 24, 2008 Term Loan Agreement.

106.    Specifically, plaintiffs maintain that, pursuant to Section 2.5 of the agreement, the interest payment due in May 2009 was to be withdrawn from the Loan Reserve Amount and that, accordingly, borrowers had no obligation to make a separate interest payment in May 2009.

1    Plaintiffs are informed and believe and thereon allege that defendants KBR and DOES 1-50

2    disagree, and instead maintain that the May 2009 interest payment to be made by borrowers

3    under the Term Loan Agreement was not be made from the Reserve Loan Amount, but that

4    borrowers must make such payments themselves.

5        107.    A judicial declaration resolving this dispute is necessary and appropriate.

6    Specifically, plaintiffs COLONY I and COLONY II request that this court declare that, pursuant

7    to Section 2.5 of the Term Loan Agreement, the interest payment due in May 2009 was to be

8    withdrawn from the Loan Reserve Amount and that, accordingly, borrowers had no obligation to

9    make a separate interest payment in May 2009.

10                                      IX.

11                            NINTH CAUSE OF ACTION

12                    (Rescission against KBR and DOES 1-50)

13       108.    Plaintiffs incorporate by reference as though set forth herein each and every

14    allegation of paragraphs 1 through 107 above.

15       109.    Plaintiffs entered into the June 24, 2008 Term Loan Agreement (Exhibit 2), the

16    KRMW Operating Agreement (Exhibit 3), the associated assignments (Exhibits 4-8), the

17    associated Security Agreement (Exhibit 9), and the November 6, 2008 Letter Agreement (Exhibit

18    10) as the result of fraud, mistake and duress. Specifically, defendants KBR and DOES 1-50

19    knew, at the time the agreements were entered into, that plaintiffs were experiencing severe cash

20    flow issues, and defendants, by duress, caused plaintiff to enter into agreements which they

21    otherwise would not have agreed to.

22       110.    Plaintiffs are further informed and believe and thereon allege that defendants KBR

23    and DOES 1-50 falsely represented, at the time KBR entered into the agreements, that KBR

24    intended to meet all obligations thereunder. To the contrary, at the time the agreements were

25    executed, defendant KBR had already determined that it would not comply with their obligations

26    under the agreements, but would instead seek to use its status as lender to plaintiffs, and its status

27    as a member of KRMW, to obtain an interest in HCC and/or The Bridges development for

28    defendants' own benefit, to the exclusion of plaintiffs.

GORDON & HOLMES
223 West Date Street San Diego, CA  92101
(619) 696-0444  Fax (619) 696-1144

111.    Defendants' representations, as alleged above, were knowingly false and made with the intent to deceive. Plaintiffs actually and reasonably relied upon the misrepresentations. Had plaintiffs known the true facts, plaintiffs would not have entered into the aforementioned agreements with KBR.

112.    In addition, the KRMW Operating Agreement (Exhibit 3), the associated assignments (Exhibits 4-8), the associated Security Agreement (Exhibit 9), and the November 6, 2008 Letter Agreement (Exhibit 10) collectively and in substance constitute a loan of money at an interest rate which is in excess of that allowed by the California Constitution (Cal. Const. Art. 15, § 1). Such loan is therefore usurious as a matter of law and subject to rescission.

113.    Based on the foregoing, plaintiffs have suffered and will continue to suffer substantial harm and injury if the agreements attached hereto as Exhibits 2 through 10 are not rescinded.

<div align="center">

**X.**

**TENTH CAUSE OF ACTION**

**(Injunctive Relief against KBR and DOES 1-50)**

</div>

114.    Plaintiffs incorporate by reference as though set forth herein each and every allegation of paragraphs 1 through 113 above.

115.    Plaintiffs will suffer immediate and irreparable harm unless this court immediately enjoins defendants KBR and DOES 1-50 from proceeding as if COLONY I and COLONY II wer in default under the June 24, 2008 Term Loan Agreement. If injunctive relief is not granted, the collateral provided under such agreement may be compromised and plaintiffs may be subjected to furtehr lawsuits or other legal action. Plaintiffs have no adequate remedy at law for the injuries that are threatened.

////

////

////

////

////

GORDON & HOLMES
223 West Date Street San Diego, CA  92101
(619) 696-0444  Fax (619) 696-1144

## XI.

### ELEVENTH CAUSE OF ACTION

**(Intentional Interference with Contract against LENNAR, MILLER, JAFFE, BECKWITT, WAMSTAD, KUCINSKI, RIVERA and DOES 40-90)**

116.    Plaintiffs incorporate by reference as though set forth herein each and every allegation of paragraphs 1 through 115 above.

117.    As alleged herein, plaintiffs entered into a contractual relationship with KBR, as reflected in the Term Loan Agreement, the KRMW Operating Agreement, and related documents.

118.    Plaintiffs are informed and believe that defendants LENNAR, MILLER, JAFFE, BECKWITT, WAMSTAD, KUCINSKI, RIVERA and DOES 40-90 were aware, at all relevant times, of the contractual relationships between plaintiffs and KBR GROUP, KBR FUND I and KBR FUND II.

119.    Defendants, and each of them, by taking the actions hereinabove described acted with an intent to interfere with plaintiffs' contractual relations with KBR GROUP, KBR FUND I and KBR FUND II.

120.    As a direct result of defendants' intentional interference, as alleged herein, plaintiffs were deprived of the economic benefits of their contractual relationship with KBR GROUP, KBR FUND I and KBR FUND II, as described above.

121.    The aforementioned acts of defendants were committed with the intent to cause economic injury to plaintiffs, and plaintiffs are therefore entitled to punitive damages.

122.    As a direct and proximate result of defendants' intentional interference with contract, plaintiffs have been and continue to be damaged in an amount to be proven at trial, including but not limited to lost economic opportunity.

////

////

////

////

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444  Fax (619) 696-1144

## XII.

## TWELFTH CAUSE OF ACTION

**(Negligent Interference with Contract against LENNAR, MILLER, JAFFE, BECKWITT, WAMSTAD, KUCINSKI, RIVERA and DOES 40-90)**

123.    Plaintiffs incorporate by reference as though set forth herein each and every allegation of paragraphs 1 through 122 above.

124.    As alleged herein, plaintiffs entered into a contractual relationship with KBR GROUP, KBR FUND I and KBR FUND II, as reflected in the Term Loan Agreement, the KRMW Operating Agreement, and related documents.

125.    Plaintiffs are informed and believe that defendants LENNAR, MILLER, JAFFE, BECKWITT, WAMSTAD, KUCINSKI, RIVERA and DOES 40-90 were aware or should have been aware, at all relevant times, of the contractual relationships between plaintiffs and KBR GROUP, KBR FUND I and KBR FUND II..

126.    Defendants, and each of them, owed plaintiffs a duty of care not to interfere with plaintiffs' contractual relationship with KBR GROUP, KBR FUND I and KBR FUND II.. By taking the actions herein above described, defendants, and each of them, negligently breached this duty of care.

127.    As a direct result of defendants' negligent interference, as alleged herein, plaintiffs were deprived of the economic benefits of their contractual relationship with KBR GROUP,. KBR FUND I and KBR FUND II, as described above.

128.    As a further direct and proximate result of defendants' negligent interference with contract, plaintiffs have been and continue to be damaged in an amount to be proven at trial, including but not limited to lost economic opportunity.

## XIII.

## THIRTEENTH CAUSE OF ACTION

**(Conspiracy to Interfere with Contract against LENNAR, MILLER, JAFFE, BECKWITT, WAMSTAD, KUCINSKI, RIVERA and DOES 40-90)**

129.    Plaintiffs incorporate by reference as though set forth herein each and every

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444  Fax (619) 696-1144

1  allegation of paragraphs 1 through 128 above.

2      130.    Defendants LENNAR, MILLER, JAFFE, BECKWITT, WAMSTAD, KUCINSKI,

3  RIVERA and DOES 40-90, and each of them, were aware of plaintiffs' contractual relationship

4  with KBR GROUP, KBR FUND I and KBR FUND II. Defendants, and each of them, were

5  further aware the plaintiffs' relationship with KBR GROUP, KBR FUND I and KBR FUND II

6  was critical to plaintiffs' liquidity position.

7      131.    Despite this knowledge, defendants, and each of them, engaged in the formation

8  and operation of a conspiracy designed to deprive plaintiffs of the economic benefits of their

9  relationship with KBR GROUP, KBR FUND I and KBR FUND II, to the detriment of plaintiffs

10  and for the sole purpose of economically benefitting the members of the conspiracy. Defendants,

11  and each of them, knew and intended that their actions would deprive plaintiffs of such rights

12  and would severely harm plaintiffs.

13      132.    In furtherance of the conspiracy, and as alleged above, defendants, and each of

14  them, reached a secret agreement designed to enhance defendants' own position, to relieve

15  LENNAR from further exposure with respect to the Lennar litigation, to terminate plaintiffs'

16  rights with respect to HCC and the Lennar litigation, and to interfere with plaintiffs' rights under

17  the agreements with KBR GROUP, KBR FUND I and KBR FUND II, all to the intended benefit

18  of defendants and the detriment of plaintiffs.

19      133.    Plaintiffs are informed and believe that defendants LENNAR, MILLER, JAFFE,

20  BECKWITT, WAMSTAD, KUCINSKI, RIVERA and DOES 40-90 continue to work together

21  to further the purpose of their conspiracy, i.e., to wrongfully deprive plaintiffs of the economic

22  benefits of their contractual relations with KBR GROUP, KBR FUND I and KBR FUND II and

23  to thereby cause plaintiffs to suffer severe financial hardship.

24      134.    The actions of the conspiracy as alleged herein constitute an intentional interference

25  with contract.

26      135.    As a proximate result of this conspiracy, plaintiffs have been damaged in an

27  amount not yet ascertained, subject to proof at trial.

28  ////

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444  Fax (619) 696-1144

## XIV.

## FOURTEENTH CAUSE OF ACTION

**(Intentional Interference with Prospective Economic Advantage against LENNAR, MILLER, JAFFE, BECKWITT, WAMSTAD, KUCINSKI, RIVERA and DOES 40-90)**

136.    Plaintiffs incorporate by reference as though set forth herein each and every allegation of paragraphs 1 through 135 above.

137.    As alleged herein, plaintiffs entered into a contractual relationship with KBR GROUP, KBR FUND I and KBR FUND II, as reflected in the Term Loan Agreement, the KRMW Operating Agreement, and related documents. As a result of such contracts, plaintiffs had the likelihood of obtaining further economic advantage with KBR GROUP, KBR FUND I and KBR FUND II. In addition, plaintiffs had various additional opportunities to invest in and develop real estate as a result of the financial security that was to be provided by the agreements with KBR GROUP, KBR FUND I and KBR FUND II.  Such additional opportunities included, but are not limited to, 515 acres of property in the City of San Jacinto, which plaintiff MARSCH (through an affiliate) had the right to purchase and develop.

138.    Plaintiffs are informed and believe that defendants LENNAR, MILLER, JAFFE, BECKWITT, WAMSTAD, KUCINSKI, RIVERA and DOES 40-90 were aware, at all relevant times, of plaintiffs' prospective economic opportunities.

139.    Defendants, and each of them, by taking the actions hereinabove described acted with an intent to interfere with plaintiffs' prospective economic opportunities for the purpose of, in part, preventing plaintiffs MARSCH and BRIARWOOD from having sufficient funds to prosecute the Bridges and McCrink Ranch Actions.

140.    As a direct result of defendants' intentional interference, as alleged herein, plaintiffs were deprived of the economic benefits of their prospective economic opportunities, as described above.

141.    The aforementioned acts of defendants were committed with the intent to cause economic injury to plaintiffs, and plaintiffs are therefore entitled to punitive damages.

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444 Fax (619) 696-1144

142. As a direct and proximate result of defendants' intentional interference with prospective economic advantage, plaintiffs have been and continue to be damaged in an amount to be proven at trial.

## XV.

## FIFTEENTH CAUSE OF ACTION

**(Negligent Interference with Prospective Economic Advantage against LENNAR, MILLER, JAFFE, BECKWITT, WAMSTAD, KUCINSKI, RIVERA and DOES 40-90)**

143. Plaintiffs incorporate by reference as though set forth herein each and every allegation of paragraphs 1 through 142 above.

144. As alleged herein, plaintiffs entered into a contractual relationship with KBR GROUP, KBR FUND I and KBR FUND II, as reflected in the Term Loan Agreement, the KRMW Operating Agreement, and related documents. As a result of such contracts, plaintiffs had the likelihood of obtaining further economic advantage with KBR GROUP, KBR FUND I and KBR FUND II. In addition, plaintiffs had various additional opportunities to invest in and develop real estate as a result of the financial security that was to be provided by the agreements with KBR GROUP, KBR FUND I and KBR FUND II. Such additional opportunities included, but are not limited to, 515 acres of property in the City of San Jacinto, which plaintiff MARSCH (through an affiliate) had the right to purchase and develop.

145. Plaintiffs are informed and believe that defendants LENNAR, MILLER, JAFFE, BECKWITT, WAMSTAD, KUCINSKI, RIVERA and DOES 40-90 were aware or should have been aware, at all relevant times, of plaintiffs' prospective economic advantage as alleged herein.

146. Defendants, and each of them, owed plaintiffs a duty of care not to interfere with plaintiffs' prospective economic relationships. By taking the actions hereinabove described, defendants, and each of them, negligently breached this duty of care.

147. As a direct result of defendants' negligent interference with prospective economic advantage, as alleged herein, plaintiffs were deprived of the economic benefits of such relationships, as described above.

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444  Fax (619) 696-1144

148.    As a further direct and proximate result of defendants' negligent interference, plaintiffs have been and continue to be damaged in an amount to be proven at trial.

### XVI.

### SIXTEENTH CAUSE OF ACTION

**(Conspiracy to Interfere with Contract against LENNAR, MILLER, JAFFE, BECKWITT, WAMSTAD, KUCINSKI, RIVERA and DOES 40 - 90)**

149.    Plaintiffs incorporate by reference as though set forth herein each and every allegation of paragraphs 1 through 148 above.

150.    Defendants LENNAR, MILLER, JAFFE, BECKWITT, WAMSTAD, KUCINSKI, RIVERA and DOES 40-90, and each of them, were aware of plaintiffs' contractual relationship with KBR GROUP, KBR FUND I and KBR FUND II. Defendants, and each of them, were further aware the plaintiffs' relationship with KBR GROUP, KBR FUND I and KBR FUND II was critical to plaintiffs' liquidity position. Defendants were aware that plaintiffs had the likelihood of obtaining further economic advantage with KBR GROUP, KBR FUND I and KBR FUND II. In addition, defendants were aware that plaintiffs had various additional opportunities to invest in and develop real estate as a result of the financial security that was to be provided by the agreements with KBR GROUP, KBR FUND I and KBR FUND II. Such additional opportunities included, but are not limited to, 515 acres of property in the City of San Jacinto, which plaintiff MARSCH (through an affiliate) had the right to purchase and develop.

151.    Despite this knowledge, defendants, and each of them, engaged in the formation and operation of a conspiracy designed to deprive plaintiffs of the economic benefits of such prospective economic relationships, to the detriment of plaintiffs and for the sole purpose of economically benefitting the members of the conspiracy. Defendants, and each of them, knew and intended that their actions would deprive plaintiffs of such rights and would severely harm plaintiffs.

152.    In furtherance of the conspiracy, and as alleged above, defendants, and each of them, reached a secret agreement designed, by interfering with plaintiffs' prospective economic relationships, to enhance defendants' own position, to relieve LENNAR from further exposure

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444 Fax (619) 696-1144

1    with respect to the Lennar litigation, and to terminate plaintiffs' rights with respect to HCC and

2    the Lennar litigation, all to the intended benefit of defendants and the detriment of plaintiffs.

3         153.    Plaintiffs are informed and believe that defendants LENNAR, MILLER, JAFFE,

4    BECKWITT, WAMSTAD, KUCINSKI, RIVERA and DOES 40-90 continue to work together

5    to further the purpose of their conspiracy, i.e., to wrongfully deprive plaintiffs of their

6    prospective economic advantage to thereby cause plaintiffs to suffer severe financial hardship.

7         154.    The actions of the conspiracy as alleged herein constitute an intentional interference

8    with prospective economic advantage.

9         155.    As a proximate result of this conspiracy, plaintiffs have been damaged in an

10   amount not yet ascertained, subject to proof at trial.

11                                   **XVII.**

12                        **SEVENTEENTH CAUSE OF ACTION**

13   **(Violation of Racketeer Influence and Corrupt Organization Act (RICO), 18 U.S.C.
     §1962(c), against LENNAR, MILLER, JAFFE, BECKWITT, WAMSTAD, KUCINSKI,**

14                         **RIVERA and DOES 40-90)**

15        156.    Plaintiffs incorporate by reference as though set forth herein each and every

16   allegation of paragraphs 1 through 155 above.

17        157.    Plaintiffs and defendants LENNAR, MILLER, JAFFE, BECKWITT, WAMSTAD,

18   KUCINSKI, RIVERA and DOES 40-90 each constitute a "person" as that term is defined in 18

19   U.S.C. §1961(3).

20        158.    Defendants were and remain an association-in-fact enterprise as defined by 18

21   U.S.C. §1961(4) ("the Enterprise") that engaged in, and whose activities affected, interstate

22   commerce.

23        159.    Defendants, and each of them, agreed to and knowingly conducted and participated

24   in the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C.

25   §1962(c) and 18 U.S.C. §1341 (frauds and swindles). Defendants' activities were devised to

26   fraudulently and unlawfully obtain, for their own benefit, all of plaintiffs' interest in HCC,

27   Lennar Bridges and the Lennar litigation. In furtherance of their pattern of racketeering activity,

28   defendants engaged in numerous and repeated predicate acts of fraud in violation of 18 U.S.C.

GORDON & HOLMES
223 West Date Street San Diego, CA  92101
(619) 696-0444   Fax (619) 696-1144

1    §1341 for at least the past seven months, including, without limitation, those acts described

2    above.

3        160.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18

4    U.S.C. §1961(5).

5        161.    The Enterprise directly and proximately injured plaintiffs through its racketeering

6    activities and violations of 18 U.S.C. §1962(c), in an amount to be proven at trial. As a direct

7    and proximate result of defendants' racketeering activities, plaintiffs are further entitled to treble

8    damages pursuant to 18 U.S.C. §1964(c), punitive damages, costs, and attorneys fees.

9        162.    Unless enjoined by this Court, defendants will continue to engage in their unlawful

10   racketeering activity and continue to harm plaintiffs through their actions. Plaintiffs are therefore

11   entitled to, and hereby request, an order enjoining defendants from actively engaging in

12   racketeering activities, including, without limitation, any and all efforts to fraudulently obtain

13   plaintiffs' interest in HCC, Lennar Bridges and/or the Lennar litigation.

<div align="center">

**XVIII.**

## EIGHTEENTH CAUSE OF ACTION

**(Violation of Business & Professions Code § 17200 et. seq. against LENNAR, MILLER, JAFFE, BECKWITT, WAMSTAD, KUCINSKI, RIVERA and DOES 40-90)**

</div>

18   163.    Plaintiffs incorporate by reference as though set forth herein each and every

19   allegation of paragraphs 1 through 162 above.

20   164.    California Business & Professions Code Section 17200 defines unfair competition

21   as "any unlawful, unfair or fraudulent business act or practice ...."

22   165.    The actions of defendants LENNAR, MILLER, JAFFE, BECKWITT,

23   WAMSTAD, KUCINSKI, RIVERA and DOES 40-90, as alleged herein, were unfair in that the

24   actions significantly threaten and harm competition and violates both the policy and spirit of

25   antitrust law. Defendants' actions further caused harm because the actions outweigh the utility

26   of such conduct and such conduct offends public policy, is immoral, unscrupulous, unethical,

27   deceitful and offensive.

28

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444   Fax (619) 696-1144

166.   The actions of defendants LENNAR, MILLER, JAFFE, BECKWITT, WAMSTAD, KUCINSKI, RIVERA and DOES 40-90 further constitute fraudulent business practices in violation of §17200 et. seq., in that members of the public were likely to be deceived by the defendants' fraudulent acts.

167.   As a direct and proximate result of the actions of defendants, as described herein, defendants have been and will be unjustly enriched at the expense of plaintiffs.

168.   The aforementioned unfair business acts or practices conducted by defendants, and each of them, have been committed in the past and continue to this day. Defendants have failed to publicly acknowledge the wrongful nature of their actions. Defendants have not provided full restitution and disgorgement of all ill-gotten monies either acquired or retained by defendants as a result thereof.

169.   Pursuant to Section 17203 of the California Business & Professions Code, plaintiffs seek an order of this Court requiring defendants to disgorge all ill-gotten gains and awarding plaintiffs all monies wrongfully acquired or retained by defendant by means of the alleged unfair or fraudulent conduct so as to restore all monies to plaintiffs which were acquired and obtained by means of such unfair conduct, and which ill-gotten gains are still retained by defendants. Plaintiffs additionally request that such funds be impounded by the Court or that an asset freeze or constructive trust be imposed upon such revenues and profits to avoid dissipation and/or fraudulent transfers or concealment of such monies by defendants. Plaintiffs may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

## XIX.

## NINETEENTH CAUSE OF ACTION

### (Breach of Contract, BRIARWOOD against LENNAR and DOES 80-100)

170.   Plaintiffs incorporate by reference as though set forth herein each and every allegation of paragraphs 1 through 169 above.

171.   As alleged above, on or about August 27, 1997, LSJH and MARSCH entered into the HCC Operating Agreement for the purpose of purchasing and developing The Bridges property. The LENNAR defendants and DOES 80-100 each are obligated to comply with the

CORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444  Fax (619) 696-1144

1    terms of the HCC Operating Agreement as assignee of LSJH and/or as Manager of HCC.

2    Plaintiff assigned his rights under the HCC Operating Agreement to plaintiff BRIARWOOD on

3    or about May 13, 1998.

4         172.    Pursuant to Section 5.04 of the HCC Operating Agreement, plaintiff

5    BRIARWOOD (as assignee of MARSCH) is to receive "unencumbered fee title to [a] Real

6    Estate Sales Facility" once the project real estate is sold out. HCC, which at all times has been

7    managed by LENNAR, was to "provide resale services within the Project until such time as the

8    Real Estate Sales Facility is distributed to" BRIARWOOD.

9         173.    Defendants LENNAR and DOES 80-100 have failed, and continue to fail, to

10   provide resale sales services within The Bridges project in a manner consistent with defendants'

11   duties and responsibilities under Section 5.04 of the HCC Operating Agreement.

12        174.    Plaintiff BRIARWOOD has performed all of its obligations under the HCC

13   Operating Agreement and LENNAR's performance is not otherwise excused.

14        175.    As a direct and proximate result of LENNAR's and DOES 80-100's material breach

15   of the HCC Operating Agreement, the residual value of the Real Estate Sales Facility has been

16   significantly reduced or eliminated. Plaintiff BRIARWOOD has thereby been damaged in an

17   amount subject to proof at trial.

18        176.    Section 12.07 of the HCC Operating Agreement expressly provides that Plaintiff

19   BRIARWOOD is entitled to recover its attorneys' fees in any action arising from Defendants'

20   breach of the agreement. Accordingly, BRIARWOOD is further entitled to recover its attorneys'

21   fees incurred herein, according to proof.

22                                  **XX.**

23                    **TWENTIETH CAUSE OF ACTION**

24      **(Breach of Contract, BRIARWOOD against LENNAR, HCC and DOES 80 -100)**

25        177.    Plaintiffs incorporate by reference as though set forth herein each and every

26   allegation of paragraphs 1 through 176 above.

27        178.    Pursuant to Section 6.05 of the HCC Operating Agreement, defendant HCC is

28   obligated to pay, and defendants LENNAR and DOES 80-100 are obligated to cause HCC to

GORDON & HOLMES
223 West Date San Diego, CA  92101
(619) 696-0444  Fax (619) 696-1144

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444   Fax (619) 696-1144

1  pay, to plaintiff BRIARWOOD certain fees, including:  (1) an annual management fee of

2  $250,000 and an annual overhead fee of $60,000, both subject to a cost of living adjustment; (2)

3  an override fee of 3 ½% of gross sales of all products within the project; and (3) one-half of the

4  resale transfer fee payable to HCC upon resales of properties located within the project.

5     179.    At all times since June 2008, defendant HCC has failed to pay, and defendants

6  LENNAR and DOES 80-100 have failed to cause HCC to pay, any of the fees due under Section

7  6.05 of the HCC Operating Agreement.

8     180.    Plaintiff BRIARWOOD has performed all of its obligations under the HCC

9  Operating Agreement and HCC's and LENNAR's performance is not otherwise excused.

10    181.    As a direct and proximate result of HCC's, LENNAR's and DOES 80-100's

11  material breach of the HCC Operating Agreement, plaintiff BRIARWOOD has been damaged in

12  an amount subject to proof at trial.

13    182.    Section 12.07 of the HCC Operating Agreement expressly provides that Plaintiff

14  BRIARWOOD is entitled to recover its attorneys' fees in any action arising from Defendants'

15  breach of the agreement.  Accordingly, BRIARWOOD is further entitled to recover, from

16  LENNAR, its attorneys' fees incurred herein, according to proof.

17    183.    The Hon. William R. Nevitt, Jr. , Judge of the Superior Court of San Diego County,

18  before whom the Bridges Action is being tried, has ruled that damages in that action shall be cut

19  off as of December 31, 2008.  Plaintiff BRIARWOOD maintains a claim against LENNAR in

20  the Bridges Action arising from LENNAR's breach of Section 6.05 of the HCC Operating

21  Agreement.  But such claim, as a result of Judge Nevitt's ruling, is limited to damages which

22  were incurred on or before December 31, 2008.  Accordingly, the present cause of action, as to

23  defendant LENNAR only, is limited to damages which were incurred after December 31, 2008.

### XXI.

### TWENTY-FIRST CAUSE OF ACTION

**(Breach of Fiduciary Duty, BRIARWOOD against LENNAR and DOES 80 -100)**

27    184.    Plaintiffs incorporate by reference as though set forth herein each and every

28  allegation of paragraphs 1 through 183 above.

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444  Fax (619) 696-1144

185. As alleged above, on or about August 27, 1997, LSJH and MARSCH entered into a Limited Liability Company Agreement of HCC Investors, LLC ("HCC Operating Agreement") for the purpose of purchasing and developing The Bridges property.

186. At all relevant times, defendants LENNAR and DOES 80-100 acted as Manager of HCC. Accordingly, and further pursuant to the express provisions of Section 6.01 of the HCC Operating Agreement, defendants owed a fiduciary duty to all members of HCC, including plaintiff BRIARWOOD.

187. By virtue of the conduct alleged herein, defendants LENNAR and DOES 80-100 breached the fiduciary duty owed to plaintiff BRIARWOOD by failing to adequately provide resale sales services within The Bridges project, so as to protect the residual value of the Real Estate Sale Facility, which is to be transferred from HCC to plaintiff BRIARWOOD once all real estate within the project has been sold. Defendants further breached the fiduciary duty owed to plaintiff BRIARWOOD by causing HCC to fail to pay, at all times since June 2008, certain fees owed by plaintiff pursuant to Section 6.05 of the HCC Operating Agreement.

188. As a direct and proximate result of LENNAR's and DOES 80-100's breaches of fiduciary duty, the residual value of the Real Estate Sales Facility has been significantly reduced or eliminated and plaintiff BRIARWOOD has otherwise been damaged in an amount subject to proof at trial.

189. The Hon. William R. Nevitt, Jr., Judge of the Superior Court of San Diego County before whom the Bridges Action is being tried, has ruled that damages in that action shall be cut off as of December 31, 2008. Plaintiff BRIARWOOD maintains a claim against LENNAR in the Bridges Action arising from LENNAR's breach of Section 6.05 of the HCC Operating Agreement. Such claim, as a result of Judge Nevitt's ruling, is limited to damages which were incurred on or before December 31, 2008. Accordingly, the present cause of action, with respect to LENNAR's action as to Section 6.05 of the HCC Operating Agreement only, is limited to damages which were incurred after December 31, 2008.

////

////

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

1.     For damages according to proof;

2.     For exemplary damages;

3.     For equitable relief;

4.     For declaratory relief as set forth;

5.     For rescission;

6.     For injunctive relief;

7.     For disgorgement of profits;

8.     For attorneys' fees;

9.     For costs of suit incurred herein; and

10.    For such other and further relief as the Court may deem just and proper.


Dated: October 26, 2009                          Respectfully submitted,

                                                 GORDON & HOLMES

                                                 By: _____
                                                     FREDERIC L. GORDON
                                                     RHONDA J. HOLMES
                                                     HEATHER T. FLYNN
                                                 Attorneys for Plaintiffs
                                                 BRIARWOOD CAPITAL, LLC, NICOLAS
                                                 MARSCH III, COLONY PROPERTIES
                                                 INTERNATIONAL, LLC and COLONY
                                                 PROPERTIES INTERNATIONAL II, LLC

GORDON & HOLMES
223 West Date Street San Diego, CA 92101
(619) 696-0444 Fax (619) 696-1144

POS-040

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Frederic L. Gordon, Esq. (SBN98994)<br>GORDON & HOLMES<br>330 West Broadway<br><br>San Diego, CA 92101<br>TELEPHONE NO.: (619) 696-0444    FAX NO. *(Optional):* (619) 696-1144<br>E-MAIL ADDRESS *(Optional):*<br>ATTORNEY FOR *(Name):* Plaintiffs Briarwood Capital, LLC et al | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego
STREET ADDRESS: 330 West Broadway
MAILING ADDRESS:
CITY AND ZIP CODE: San Diego, CA 92101
BRANCH NAME: Central Division

PETITIONER/PLAINTIFF: Briarwood Capital, LLC, et al.

RESPONDENT/DEFENDANT: KBR Group, LLC, et al,

| | CASE NUMBER:<br>37-2009-00100835-CU-BC-CTL |
|---|---|

| PROOF OF SERVICE—CIVIL<br>Check method of service *(only one):*<br>[  ] By Personal Service    [  ] By Mail    [  ] By Overnight Delivery<br>[ X ] By Messenger Service    [  ] By Facsimile    [  ] By E-Mail/Electronic Transmission | JUDGE:<br><br>DEPT.: |
|---|---|

*(Do not use this Proof of Service to show service of a Summons and Complaint.)*

1. At the time of service I was over 18 years of age and **not a party to this action.**

2. My address is *(specify one):*

    a. [X] Business: Gordon & Holmes        b. [  ] Residence:
              223 West Date Street
              San Diego, CA 92101

3. On *(date):* October 27, 2009    I served the following **documents** *(specify):* SUMMONS; NOTICE OF RELATED CASE; NOTICE OF CASE ASSIGNMENT; NOTICE TO LITIGANTS/ADR INFORMATION PACKAGE; STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION PROCESS; AND COMPLAINT

    [  ] The documents are listed in the *Attachment to Proof of Service–Civil (Documents Served)* (form POS-040(D)).

4. I served the documents on the **persons** below, as follows:

    a. Name of person served: HCC Investors, LLC, C T Corporation System

    b. Address of person served: 24800 Chrisanta Drive, Mission Viejo, CA 92691

    c. Fax number or e-mail address of person served, if service was by fax or e-mail:

    d. Time of service, if personal service was used:

    [  ] The names, addresses, and other applicable information about the persons served is on the *Attachment to Proof of Service—Civil (Persons Served)* (form POS-040(P)).

5. The documents were served by the following means *(specify):*

    a. [  ] **By personal service.** I personally delivered the documents to the persons at the addresses listed in item 4.
        (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

| Form Approved for Optional Use<br>Judicial Council of California<br>POS-040 [New January 1, 2005] | **PROOF OF SERVICE—CIVIL**<br>**(Proof of Service)** | Legal<br>Solutions<br>& Plus | Code of Civ. Proc., §§ 1011,<br>1013, 1013a, 2015.5 |
|---|---|---|---|

EXHIBIT A<br>Page 44

| CASE NAME Briarwood Capital, LLC et al. v. KBR Group, LLC, et al. | CASE NUMBER: 37-2009-00100835-CU-BC-CTL |
| --- | --- |

5 b. ☐ **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 4 and *(specify one):*

(1) ☐ deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

(2) ☐ placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at *(city and state):*

c. ☐ **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 4. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

d. ☒ **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in item 4 and providing them to a professional messenger service for service. *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)*

e. ☐ **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in item 4. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

f. ☐ **By e-mail or electronic transmission.** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed in item 4. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: October 27, 2009

Kristina Manthie
(TYPE OR PRINT NAME OF DECLARANT)                    [SIGNATURE OF DECLARANT]

*(If item 5d above is checked, the declaration below must be completed or a separate declaration from a messenger must be attached.)*

### DECLARATION OF MESSENGER

☐ **By personal service.** I personally delivered the envelope or package received from the declarant above to the persons at the addresses listed in item 4. (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package, which was clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

At the time of service, I was over 18 years of age. I am not a party to the above-referenced legal proceeding.

I served the envelope or package, as stated above, on *(date):* October 27, 2009

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: October 27, 2009

(NAME OF DECLARANT)                    (SIGNATURE OF DECLARANT)

**PROOF OF SERVICE—CIVIL**
**(Proof of Service)**

**EXHIBIT A**
**Page 45**

Ex. 1

EXHIBIT A
Page 46

LIMITED LIABILITY COMPANY AGREEMENT

OF

HCC INVESTORS, L.L.C.

Dated as of August 27, 1997



PW 3512

LGC03310

EXHIBIT A
Page 47

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | DEFINED TERMS | 2 |
| | 1.01 Defined Terms | 2 |
| II. | ORGANIZATION | 10 |
| | 2.01 Formation of Company | 10 |
| | 2.02 Name; Registered Office and Agent | 10 |
| | 2.03 Purpose | 11 |
| | 2.04 Term | 11 |
| | 2.05 Modifications to Structure | 11 |
| | 2.06 No Partnership | 12 |
| | 2.07 Title to Company Property | 13 |
| | 2.08 Nature of Members' Interest | 13 |
| | 2.09 Members' Names and Addresses | 13 |
| III. | CAPITAL | 13 |
| | 3.01 Initial Capital Contributions | 13 |
| | 3.02 Additional Capital Contributions | 14 |
| | 3.03 Capital Accounts | 14 |
| | 3.04 No Further Capital Contributions | 15 |
| | 3.05 Preference Return | 15 |
| | 3.06 Preference Accounts | 15 |
| IV. | INTERESTS IN THE COMPANY | 17 |
| | 4.01 Return of Capital | 17 |
| | 4.02 Waiver of Partition | 17 |
| V. | ALLOCATIONS AND DISTRIBUTIONS | 17 |
| | 5.01 Allocations | 17 |
| | 5.02 Distributions | 20 |
| | 5.03 Tax Distribution | 21 |
| | 5.04 Special Distribution | 21 |
| | 5.05 Distributions in Liquidation | 22 |
| | 5.06 Tax Matters Partner | 22 |
| | 5.07 Tax Matters | 22 |
| | 5.08 Certain Payments to the Internal Revenue Service Treated as Distributions | 22 |
| VI. | MANAGEMENT | 23 |
| | 6.01 Management | 23 |
| | 6.02 Members of the Executive Committee | 24 |
| | 6.03 Business Plan | 25 |
| | 6.04 Duties and Conflicts | 26 |

SD\1087804-6

-i-

PW 3513

LGC03311

EXHIBIT A
Page 48

6.05  Services of Marsch, Distributions to Marsch and Lennar . . . . . . . . . .   27
6.06  Prior Investors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

VII.   BUY-SELL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
7.01  General Provisions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
7.02  Termination of Other Agreements . . . . . . . . . . . . . . . . . . . . . . .   30

VIII.  BOOKS AND RECORDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30
8.01  Books and Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30
8.02  Accounting and Fiscal Year . . . . . . . . . . . . . . . . . . . . . . . . . . .   30
8.03  Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30
8.04  The Company Accountant . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32
8.05  Reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

IX.    TRANSFER OF COMPANY INTERESTS . . . . . . . . . . . . . . . . . . .   32
9.01  Substitution and Assignment of Member's Interest . . . . . . . . . . . .   32
9.02  Additional Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33
9.03  Permitted Transfers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

X.     TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
10.01  Marsch and Lennar's Option to Liquidate. . . . . . . . . . . . . . . . .   35
10.02  Dissolution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
10.03  Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36
10.04  Liquidator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

XI.    DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37
11.01  Events of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37
11.02  Effect of Event of Default . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

XII.   MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38
12.01  Representations and Warranties of the Members. . . . . . . . . . . . .   38
12.02  Further Assurances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40
12.03  Indemnities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40
12.04  Exculpation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41
12.05  Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41
12.06  Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42
12.07  Attorneys' Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42
12.08  Captions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42
12.09  Pronouns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42
12.10  Successors and Assigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42
12.11  Extension Not a Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42
12.12  Creditors Not Benefited . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42
12.13  Recalculation of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43
12.14  Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43
12.15  Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43
12.16  Publicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

SD\1087804-4

PW 3514

LGC03312

EXHIBIT A
Page 49

12.17  Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
12.18  Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
12.19  Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
12.20  Arbitration of Disputes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

SQ\1087504-6

PW 3515

LGC03313

## LIMITED LIABILITY COMPANY AGREEMENT
### OF
### HCC INVESTORS, L.L.C.

THIS LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") is made and entered into as of August 27, 1997, [the Closing Date, as defined in the Formation Agreement] by and between LENNAR SAN JOSE HOLDINGS, INC., a California corporation ("Lennar") and NICOLAS MARSCH III ("Marsch"). Lennar and Marsch are sometimes hereinafter collectively referred to as the "Members" and individually as a "Member."

### RECITALS

A.   Lennar and the Marsch Entities entered into that certain Formation Agreement dated as of February 16, 1996 (the "Formation Agreement") which provides, among other things, for the formation of the Delaware limited liability company contemplated by this Agreement. The Formation Agreement was amended, restated and superseded in its entirety by that certain Amended and Restated Formation Agreement dated as of June 17, 1997 ("Restated Formation Agreement").

B.   The conditions to formation of the Delaware limited liability company contemplated by this Agreement have now been satisfied or waived, and the parties desire to enter into this Agreement.

C.   Marsch and Lennar desire to form HCC Investors, L.L.C. (the "Company") for the purpose of holding title to, and further developing that certain property located in Rancho Santa Fe, San Diego County, California consisting of 540 acres and currently owned by the Williams Entities subject to the pending appeal in Case No. N48177 (the "Property"). Lennar desires to contribute certain capital contributions as set forth herein to facilitate the development and marketing of the Property, known currently as the Horizon Country Club property, which is currently comprised of 237 residential lots and an 18 hole golf course and country club. The development plan contemplates the potential acquisition of adjacent parcels or parcels related to the Project, if economically feasible, and inclusion of any such parcel or parcels within the Horizon masterplan, as amended from time to time. The Company's development activities may include but not be limited to residential lot sales, builder participation, sale of club memberships, and related activity but would not include separate homebuilding activities undertaken by Lennar or Marsch (the "Project"). This is not meant to preclude either Party alone or with others from engaging in non-Project related real estate acquisition and development activities in the Rancho Santa Fe area.

SD\1007404-6

PW 3516

LGC03314

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the agreements hereinafter set forth, the parties hereby agree as follows:

## I. DEFINED TERMS

1.01  **Defined Terms.**  As used in this Agreement, the terms set forth in this Section 1.01 have the following meanings:

"**Accredited Investor**" has the meaning set forth in Rule 501(a) under the Securities Act of 1933, as amended.

"**Act**" means the Limited Liability Company Act as enacted in the State of Delaware.

"**Additional Capital Contributions**" has the meaning set forth in Section 3.02.

"**Adjusted Capital Account**" means, for each Member, such Member's Capital Account balance increased by such Member's share of minimum gain as calculated pursuant to Section 1.704-2 of the Regulations.

"**Adverse Change**" has the meaning set forth in Section 2.05(a).

"**Affiliate**" means with respect to any Member, (i) any Person directly or indirectly controlling, controlled by, or under common control with that Member, or (ii) any Person owning or controlling 10% or more of the outstanding voting interests of that Member, or (iii) any officer, director, general partner or member of that Member, or (iv) any Person which is an officer, director, member, general partner or holder of 10% or more of the voting interests of a Person described in clauses (i) through (iii) of this definition, or (v) any Person related by blood or marriage to any Person described in clauses (i) through (iv) of this definition, or to the spouse of any of the foregoing Persons.

"**Bankruptcy**" means with respect of any Person that such Person shall (i) generally fail or admit its inability to pay its debts as they become due; or (ii) suffer or consent to or apply for the appointment of a receiver, trustee, custodian or liquidator of itself or any of its property, or shall make a general assignment for the benefit of its creditors; or (iii) file a voluntary petition in bankruptcy, or seek reorganization, in order to effect a plan or other rearrangement with creditors or any other relief under the Bankruptcy Code or under any state or Federal law granting relief to debtors, whether now or hereafter in effect; or (iv) be adjudged as bankrupt, or be the subject of an order for relief entered by any court of competent jurisdiction under the Bankruptcy Code or any other state or Federal law relating to bankruptcy, reorganization or the relief for debtors; or (v) have filed or commenced against such

LGC03315

EXHIBIT A
Page 52

Person any involuntary petition or proceeding pursuant to the Bankruptcy Code or any other applicable state or Federal laws relating to bankruptcy or reorganization or other relief for debtors unless the petition is dismissed within 60 days after filing.

"Bankruptcy Code" means 11 U.S.C. Section 101, et seq., as amended or recodified from time to time.

"Book Basis" means with respect to any asset, the asset's adjusted basis for federal income tax purposes; provided, however, (i) if property is contributed to the Company, the initial Book Basis of such property shall equal its fair market value on the date of contribution, and (ii) if the Capital Accounts of the Members are adjusted pursuant to Treasury Regulation Section 1.704-1(b) to reflect the fair market value of any Company asset, the Book Basis of such asset shall be adjusted to equal its respective fair market value as of the time of such adjustment in accordance with such Treasury Regulation. The Book Basis of all assets shall be adjusted thereafter by depreciation as provided in Treasury Regulation Section 1.704-1(b)(2)(iv)(g) and any other adjustment to the basis of assets other than depreciation or amortization.

"Business Plan" has the meaning set forth in Section 6.03(a).

"Buy-Sell Price" has the meaning set forth in Section 7.01(b).

"Buy-Sell Procedure" has the meaning set forth in Section 7.01(b).

"Capital Account" means the separate account maintained for each Member under Section 3.03.

"Capital Contributions" for any Member means the aggregate of such Member's Initial Capital Contribution and Additional Capital Contributions.

"Certificate" has the meaning set forth in Section 2.01(a).

"Claims" means, collectively, all claims, actions, causes of action, settlements, judgments, awards, adjudications, or other rights of the Marsch Entities or their affiliates against the Williams Entities or their affiliates, whether in litigation, arbitration, administrative proceedings, mediation or negotiation, including, without limitation, any of the foregoing with respect to the Horizon Litigation, the La Jolla Litigation and the Intermountain Litigation, except (i) with respect to the Intermountain Litigation the first $3,000,000 of any judgment or award shall be payable solely to Marsch after repayment to Lennar of any funds advanced in pursuit of the Intermountain Litigation, and (ii) with respect to cash deposits currently in the Horizon Properties bond account to secure construction of public improvements in the Project, the first $2,000,000 released shall be paid 50% directly to Lennar and 50% directly to Marsch.

SD\1087804-6

-3-

PW 3518

LGC03316

"Closing Date" means the date of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"COL Adjustment" means an adjustment for cost of living increases, as measured by the increase in the Consumer Price Index/All Urban Consumers for the Los Angeles-Anaheim-Riverside CSMA, published by the United States Department of Labor, Bureau of Labor Statistics, which increase shall be calculated by comparing the published index most immediately preceding the date upon which an adjustment is to occur to the published index most immediately preceding the Closing Date.

"Company" means HCC Investors, L.L.C., a Delaware limited liability company.

"Company Accountant" has the meaning set forth in Section 8.04.

"Company Capital" means an amount equal to the sum of all of the Members' Adjusted Capital Account balances determined immediately prior to the allocation to the Members pursuant to Sections 5.01(a)(ii) or 5.01(b)(i) of any Net Profit or Net Loss, increased by the aggregate amount of Net Profit to be allocated to the Members pursuant to Section 5.01(a)(ii) or decreased by the aggregate amount of Net Loss to be allocated to the Members pursuant to Section 5.01(b)(i).

"Company Property" means all property, real, personal or mixed, owned by or leased to the Company.

"Disability" means the inability, for medical or other reasons, of an individual to actively handle his or her own affairs.

"Distribution" has the meaning set forth in Section 5.02.

"Economic Interest" means a Person's right to share in the income, gains, losses, deductions, credits or similar items of, and to receive Distributions from, the Company, exclusive of any other rights of a Member including, without limitation, the right to vote or to participate in management, or any right to information concerning the business and affairs of the Company.

"Election Notice" has the meaning set forth in Section 7.01(d).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Event of Default" has the meaning set forth in Section 11.01.

PW 3519

LSJH000541

LGC03317

"Executive Committee" means the committee formed and operated pursuant to Section 6.02.

"Force Majeure Event" means one or more of the following factors or occurrences: (i) governmental rules or regulations applicable to the Project are materially modified to the substantial detriment of the Project; or (ii) fire, earthquake, abnormal rains, or other acts of God, acts of public enemy, rioting, insurrection, strikes, boycotts or reasonably unforeseeable shortages of labor or materials.

"Formation Agreement" has the meaning set forth in Recital A.

"Horizon Litigation" means all past and present litigation related to (i) Marsch's disputes with the Williams Entities concerning Horizon Properties and (ii) Marsch's efforts to maintain his ownership interest in the Property, including but not limited to the pending appeal of that certain May 31, 1996 order confirming the sale of the property in the litigation captioned Marsch v. Williams, et al., pending in the Superior Court of the State of California for the County of San Diego, Case No. N48177.

"Horizon Properties" means that certain California general partnership between NHG (as successor to Marsch) and Ronald Williams, formed on December 18, 1986.

"Incompetency" with respect to a natural person means (i) a final judicial determination that a person is not competent to handle his own affairs, whether by reason of physical or mental incapacity or otherwise, (ii) the entrustment to a court-appointed fiduciary of such person's property, or (iii) the appointment of a guardian for such person's affairs.

"Information" has the meaning set forth in Section 12.19.

"Initial Capital Contribution" means the aggregate value of the capital contributions made by a Member pursuant to Section 3.01.

"Intermountain Litigation" means the litigation captioned Nicolas Marsch III vs. Ronald William, Et Al., pending in the Superior Court of the State of California for the County of Santa Clara, Case No. CV753233 as the same may be amended, moved, refiled, appealed, retried or otherwise modified and any other litigation substantially related to the claims asserted in such captioned litigation.

"La Jolla Litigation" means the litigation captioned Nicolas Marsch III vs. Ronald Williams, Et Al., pending in the Superior Court of the State of California for the County of San Diego, Case No. 654159, as the same may be amended, moved, refiled, appealed, retried or otherwise modified and any other litigation substantially related to the claims asserted in such captioned litigation.

LSTH000542

LGC03318

EXHIBIT A
Page 55

"Lennar" means Lennar San Jose Holdings, Inc., a California corporation, and its permitted successors and assigns.

"Lennar's Prior Advances" has the meaning set forth in Section 2.1.1 of the Restated Formation Agreement.

"Litigation Proceeds" mean any real property, personal property or cash proceeds from the judgment, compromise or settlement of the Claims, including without limitation the Horizon Litigation, the La Jolla Litigation or Intermountain Litigation, or judgment in favor of the Marsch Entities in the Horizon Litigation, the La Jolla Litigation or Intermountain Litigation, except (i) with respect to the Intermountain Litigation the first $3,000,000 of any judgment or award shall be payable solely to Marsch after repayment to Lennar of any prior advance in pursuit of the Intermountain Litigation and (ii) with respect to cash deposits currently in the Horizon Properties bond account to secure construction of public improvements in the Horizon Project, the first $2,000,000 released shall be paid 50% directly to Lennar and 50% directly to Marsch.

"Marsch" means Nicolas Marsch III, and his permitted successors and assigns.

"Marsch Entities" means Marsch and/or NHG, conjunctively or disjunctively, whichever the context requires.

"Marsch Operating Expenses" means expenses incurred by Marsch other than in connection with pursuit of the Claims arising out of efforts to maintain or acquire ownership of the Property and the Project, pursuant to a schedule prepared by Marsch subject to reasonable approval by Lennar.

"Members" means, collectively, Lennar and Marsch.

"Membership Interest" means a membership interest as defined by the Act.

"Necessary Expenses" means debt service on any material indebtedness of the Company, including the expense of curing any defaults thereunder; real estate taxes and assessments; emergency repairs or other immediately necessary expenditures; utility charges, repairs, additions or modifications to comply with applicable laws or insurance requirements; insurance premiums for insurance policies; and any final orders, judgments, or other proceedings and all costs and expenses related thereto.

"Net Cash Flow" means for any period for which the sum is being computed, the excess of (a) Revenues for such period, over (b) Project Expenses for such period.

SD\1067804-6                          -6-                          PW 3521

LGC03319

EXHIBIT A
Page 56

"Net Profit" and "Net Loss" means for each taxable year or other period, an amount equal to the Company's taxable income or loss for the year or other period, determined in accordance with Section 703(a) of the Code (including all items of income, gain, loss or deduction required to be stated separately under Section 703(a)(1) of the Code), with the following adjustments:

(a)    any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profit or Net Loss shall be added to taxable income or loss.

(b)    any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures under Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profit or Net Loss, shall be subtracted from taxable income or loss;

(c)    gain or loss resulting from any disposition of Company Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Basis of the property, notwithstanding that the adjusted tax basis of the property differs from its Book Basis;

(d)    in lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account depreciation for the taxable year or other period as determined in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g);

(e)    any items specially allocated pursuant to Section 5.01 shall not be considered in determining Net Profit or Net Loss; and

(f)    any increase or decrease to Capital Accounts as a result of any adjustment to the book value of Company assets pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(g) shall constitute an item of Net Profit or Net Loss as appropriate.

"Non-Approved Encumbrances" means any encumbrances, liens, claims, obligations or liabilities relating to the Property which are not Pre-Approved Encumbrances.

"Nonrecourse Indebtedness" has the meaning set forth in Treasury Regulation Section 1.704-2, or successive provision.

"Offer Notice" has the meaning set forth in Section 7.01(b).

"Offeree" has the meaning set forth in Section 7.01(b).

"Offeree Value" has the meaning set forth in Section 7.01(c).

SD\1087804-6

-7-

PW 3522

LGC03320

EXHIBIT A
Page 57

"Offeror" has the meaning set forth in Section 7.01(b).

"Offeror Value" has the meaning set forth in Section 7.01(c).

"Operating Deficit" means the amount, if any, by which the sum of the due and unpaid Project Expenses at any time plus the amount of any working capital reserve (as set forth in any then applicable Business Plan) exceeds the cash on hand of the Company on such date (including, without limitation, funds borrowed by the Company with the approval of the Executive Committee for purposes of paying such Project Expenses).

"Operating Deficit Notice" has the meaning set forth in Section 3.02.

"Parcel" means any subdivision of the Property.

"Payout Interest" means the interest of a Member in distributions under Section 5.02, expressed as a percentage of the whole. The Payout Interest of Lennar shall be 50% and the Payout Interest of Marsch shall be 50%.

"Percentage Interest" means, with respect to each Member, an amount equal to the Payout Interest of such Member.

"Person" means any individual, partnership, corporation, limited liability company, trust or other entity.

"Plan Asset Rules" has the meaning set forth in Section 2.05(a).

"Pre-Approved Encumbrances" means, collectively, the encumbrances, liens, claims, obligations and liabilities relating to the Property described on Schedule A attached hereto.

"Prior Investors" means the persons identified on Schedule B attached hereto, and to be paid in accordance with the Business Plan.

"Project" has the meaning set forth in Recital C.

"Project Expenses" means all costs and expenses incurred by the Company in connection with the ownership, maintenance, management, operations, development, construction, reserves, sales, financing or refinancing of the Company Property which are included in the Business Plan, or otherwise approved in writing by the Executive Committee.

"Project Manager" means the entity or individual designated under Section 6.01(a).

LGC03321

"Property" has the meaning given in Recital A.

"Purchaser" has the meaning set forth in Section 7.01(e).

"Real Estate Sales Facility" means the lot appurtenant to Unit 4 of the tentative map designated "sales administration area," together with any improvements thereon, and a covenant designating this facility as the exclusive and only authorized real estate sales facility within the Project, plus any additional facilities acquired or constructed in the future and designated for such purpose.

"Reasonable Period" means 30 calendar days after the defaulting Member receives written notice of its Event of Default from a non-defaulting Member; provided, however, that if such Event of Default can be cured but cannot reasonably be cured within that 30-day period, the period shall continue, if the defaulting Member commences to cure the breach within such 30 day period, for so long as the defaulting Member diligently prosecutes the cure to completion up to a maximum of 90 calendar days.

"Regulations" means Treasury regulations promulgated under the Code.

"Restated Formation Agreement" has the meaning set forth in Recital A.

"Revenues" means for any period for which such Revenues are being determined, the sum of the total gross revenues received by the Company during such period, including all receipts of the Company from (a) business interruption insurance, if any, (b) funds made available to the extent such funds are withdrawn from the Company's reserve accounts and deposited into the Company's operating account(s), (c) proceeds from the sale or disposition of any Company Property or interests in the Company, (d) proceeds from the financing, refinancing or securitization of any Company Property, (e) any Litigation Proceeds, and (f) other revenues and receipts realized by the Company, including, without limitation Capital Contributions.

"Seller" has the meaning set forth in Section 7.01(e).

"Strategic Funding" means the funds advanced by Lennar from time to time in accordance with Article 2 of the Restated Formation Agreement.

"Sub-Entity" means any corporation, partnership, limited liability company or trust formed with the approval of the Executive Committee for purposes of owning, holding, developing, maintaining or otherwise realizing the economic benefit from any Parcel.

SD\1087604-6

-9-

PW 3524

LGC03322

EXHIBIT A
Page 59

"Substitute Member" means an Assignee who has been admitted to all of the rights of membership, including any management rights, pursuant to the Operating Agreement.

"Transfer" has the meaning set forth in Section 9.01(a).

"UBTI" means "unrelated business taxable income" as defined in Code Sections 512 through 514.

"Valuation Agent" has the meaning set forth in Section 2.05(b).

"Williams Entities" means, collectively, Ronald Williams, the Ronald Williams Living Trust, the Palo Alto Town & Country Village, Inc., and/or any related or affiliated entities of Ronald Williams.

## II. ORGANIZATION

### 2.01  Formation of Company.

(a)    The Members do hereby form and constitute themselves as a Delaware limited liability company under the Limited Liability Company Act as enacted in the State of Delaware (the "Act"). In connection therewith, Nicolas Marsch III and Jonathan M. Jaffe, in their capacity as authorized representatives of the Company, shall execute a Certificate of Formation for the Company (the "Certificate") as an authorized person in accordance with the Act which shall be duly filed with the Office of the Secretary of the State of Delaware.

(b)    Prior to the Company's conducting business in any jurisdiction other than the State of Delaware, the Company shall comply, to the extent procedures are available, with all requirements necessary to qualify the Company as a foreign limited liability company in the State of California and in each such jurisdiction where foreign qualification is either necessary or appropriate. Each Member shall execute, acknowledge, swear to and deliver all certificates and other instruments conforming to this Agreement that are necessary or appropriate to qualify, or, as appropriate, to continue or terminate such qualification of, the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

### 2.02  Name; Registered Office and Agent.

(a)    The name of the Company shall be "HCC Investors, L.L.C." The Executive Committee may change the name of the Company from time to time and may adopt one or more fictitious names for use by the Company. All business of the Company shall be conducted under such name, and title to all Company Property shall be held in such name. The principal place of business and office of

LGC03323

EXHIBIT A
Page 60

the Company shall be located at 23333 Avenida la Caza, Coto de Caza, California 92679, or at such other place or places as the Executive Committee may from time to time designate.

(b)    The Company shall maintain a registered office in Delaware at, and the name and address of the Company's resident agent in Delaware is, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Such office and such agent may be changed from time to time by the Executive Committee.

2.03    Purpose.    The purpose of the Company shall be to acquire the Property, to develop and market the Property as the Project, to engage in the acquisition, development, management, or participation in properties or other opportunities that are adjacent to or relate to the Project, and to conduct any business or activities incidental thereto.

2.04    Term.    The term of the Company shall commence on the date of filing the Certificate pursuant to the Act and shall continue until December 31, 2015, unless sooner terminated or further extended by the Executive Committee pursuant to the provisions of this Agreement.

2.05    Modifications to Structure.

(a)    To qualify and/or preserve the status of Lennar or the Company as an "operating company" under the plan asset rules of ERISA at 29 C.F.R. 2510.3-101 (the "Plan Asset Rules"), to avoid the imposition of a corporate tax on any income of the Company, or to minimize the effects of any UBTI on Lennar or its respective partners or members, each Member agrees to consent to modifications proposed in writing from time to time by Lennar to the structure of the Company and/or the Company's investment in, and ownership of, the Company Property and/or to the terms of this Agreement, if in any such case the modifications shall not materially adversely affect the tax position, aggregate amount or timing of capital contributions, payment of fees, distributions of Net Cash Flow and liquidation proceeds or the aggregate allocations of Net Profit and Net Loss to Marsch; provided, however, that if the modifications do have such a material adverse affect (an "Adverse Change"), Lennar may elect, after the determination of the value of such Adverse Change in accordance with the provisions of Section 2.05(b), to make such modifications. Subject to and specifically limited to the foregoing, any such modification may include, without limitation, the formation by the Members of other limited liability companies, partnerships, corporations, or other entities (including, without limitation, corporations and trusts that qualify as real estate investment trusts under Section 856 of the Code) to be owned by the Members or their Affiliates and which shall be substituted as Members of the Company. Marsch agrees to cooperate with Lennar and to execute, acknowledge, deliver, file, record and publish all such documents, agreements and instruments and to do all such other acts and things as Lennar determines are reasonably necessary to implement the foregoing, subject to

SD\1067304-6

-11-

PW 3526

LGC03324

EXHIBIT A
Page 61

the limitations set forth in the first sentence of this Section 2.05(a). Lennar shall bear the legal and accounting costs and expenses in connection with any modifications made pursuant to this Section 2.05 and the formation of any additional entities to own any interest in the Company in connection with any of the foregoing; provided, however, that all fees and expenses of the Valuation Agent shall be treated as Project Expenses.

(b)    In the event Marsch reasonably determines that a modification requested by Lennar pursuant to Section 2.05(a) may result in an Adverse Change, Marsch shall so notify Lennar in writing within 30 days from the receipt of Lennar's written request for a proposed modification, including an estimate of the economic value of the Adverse Change incurred by Marsch. If the Members are unable to mutually agree upon the amount thereof within 30 days from the date of the written notice from Marsch, the value of such Adverse Change shall be determined by the following valuation procedure: (i) Lennar and Marsch shall, within 10 days after the expiration of the foregoing 30-day period, mutually agree on an independent third party (the "Valuation Agent") to determine the economic value of the Adverse Change to Marsch arising from a modification resulting from a modification described in Section 2.05(a); (ii) if the parties are unable to agree on a Valuation Agent within such 10-day period, the Valuation Agent shall be a Person competent to determine the economic value of the Adverse Change appointed by the Chief Judge of the Superior Court of the State of California for the County of San Diego acting as an individual. In making its determination of the economic value of the Adverse Change, the Valuation Agent shall consider the impact of the modifications on the amounts and timing of capital contributions, tax consequences to Marsch, fees payable and distributions of Net Cash Flow and liquidation proceeds, the allocations of Net Profit and Net Loss to Marsch and such other matters as the Valuation Agent shall reasonably determine to be material to a determination of the economic value of the Adverse Change. Any Valuation Agent selected shall be independent and shall not have performed any appraisal or valuation services for the Company, Lennar or Marsch at any time during the two - year period prior to its selection. Within 30 days after the selection of the Valuation Agent, the Valuation Agent shall deliver to the Members a written report of the foregoing valuation, and the determination of the Valuation Agent thereon shall be conclusive and binding upon the Members. Within 15 days of the receipt of such report, if Lennar elects to proceed with the requested modification, the members of Lennar shall pay to Marsch, the amount of the economic value of the Adverse Change to Marsch determined by the Valuation Agent.

2.06    No Partnership. The Members intend that the Company not be a general partnership, limited partnership or joint venture, and that no Member be considered a partner or joint venturer of any other Member for any purposes other than foreign and domestic federal, state, provincial and local income tax purposes, and this Agreement shall not be construed to suggest otherwise.

SD\1087804-6

-12-

PW 3527

LGC03325

EXHIBIT A
Page 62



2.07  Title to Company Property.  The Company Property, whether real or personal, tangible or intangible, shall be deemed to be owned by the Company as an entity, and no Member, individually, shall have any ownership of such property. The Company may hold any of its assets in its own name or in the name of its nominee, which nominee may be one or more trusts.  Any property held by a nominee trust for the benefit of the Company shall, for purposes of this Agreement be treated as if such property were directly owned by the Company.

2.08  Nature of Members' Interest.  The interest of each Member in the Company is personal property and shall not, under any circumstances, be considered real property.

2.09  Members' Names and Addresses.  The names and business addresses of each Member are set forth on Schedule C.  Additional Members may be admitted in accordance with the procedures specified in Section 9.02. A Member may not resign from the Company.  A Member may terminate its Membership Interest only by an assignment thereof as permitted under this Agreement.

## III.  CAPITAL

3.01  Initial Capital Contributions.

(a)    The Initial Capital Contributions of Lennar to the capital of the Company as of the date of this Agreement shall be as follows:  (i) all amounts advanced by Lennar as the Strategic Funding under Section 2.1 of the Restated Formation Agreement through the date of this Agreement, (ii) any additional amounts required to be contributed by Lennar as Strategic Funding under Section 2.1 of the Restated Formation Agreement, and (iii) any additional amounts necessary to acquire the Property, necessary to settle and obtain releases of Non-Approved Encumbrances, necessary to pay all expenses incidental to the formation of the Company; and necessary following the formation of the Company in order to implement and carry out the Business Plan until third-party financing is obtained.

(b)    Marsch shall contribute $100.00 as its Initial Capital Contribution.  In addition, to the extent that the Marsch Operating Expenses have not been paid in full pursuant to Section 2.1.3 of the Restated Formation Agreement as of the date of this Agreement, such unpaid Marsch Operating Expenses shall be deemed to be a Capital Contribution of Marsch.  Marsch shall also contribute to the Company all of Marsch's expertise and experience in the development and marketing of projects similar to the Project.

(c)    In addition to the contributions described in Sections 3.01(a) and 3.01(b) above, Lennar and Marsch shall each contribute to the Company fifty percent (50%) of the Claims, including, without limitation, all real property, personal property or cash proceeds of the Litigation Proceeds.  Lennar and

SD\1087804-6

-13-

PW 3528

LGC03326

EXHIBIT A
Page 63

Marsch shall agree upon the fair market value of such contribution for the purposes of Section 3.03.

3.02  Additional Capital Contributions.  The Members contemplate obtaining conventional financing to satisfy Necessary Expenses and Project Expenses, and the Members shall use their best efforts to obtain such financing on the best possible terms on behalf of the Company, but under no circumstances shall the Members (or any of their Affiliates), or any one of them, be obligated to undertake personal liability in the repayment of such financing.  If (i) at any time and from time to time after funding of the Initial Capital Contribution, an Operating Deficit shall occur or be reasonably projected to occur by the Executive Committee, and (ii) the Executive Committee has determined not to, or is otherwise unable to, fund same from the proceeds of a loan, then the Executive Committee shall notify the Members thereof in writing (an "Operating Deficit Notice").  If any Member reasonably determines that the Executive Committee has failed to timely notify the Members of any such Operating Deficit, such Member shall be entitled to issue the Operating Deficit Notice.  In determining whether the issuance by any such Member of an Operating Deficit Notice is reasonable, all reasonably relevant factors shall be taken into account, including, without limitation, whether any Necessary Expenses are then due and payable by the Company.  The Operating Deficit Notice shall (i) explain the Company's need for additional cash, (ii) include a reasonably detailed breakdown of the Project Expenses which are required to be paid in order to eliminate such Operating Deficit, and (iii) set forth the date when the Operating Deficit is reasonably anticipated to occur (if it has not already occurred).  On or before the expiration of 15 days following delivery of the Operating Deficit Notice, or at least 15 days prior to the date specified in the Operating Deficit Notice as the date such Operating Deficit is reasonably anticipated to occur (if the Operating Deficit has not yet occurred), the Members may contribute (in equal amounts or, to the extent that one Member declines to contribute an amount equal to the other, then the other Member may cover all or a part of the shortfall caused thereby), in cash, to the capital of the Company (each such contribution constituting an "Additional Capital Contribution" in respect of such Member) an amount equal to the amount of the Operating Deficit.

3.03  Capital Accounts.  A separate account (a "Capital Account") shall be maintained for each Member in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv).  The Capital Account of each Member shall be determined and adjusted as follows:

(a)    Each Member's Capital Account shall be credited with:

(i)    any contributions of cash made by such Member to the capital of the Company plus the Book Basis of any property contributed by such Member to the capital of the Company (net of any liabilities to which such property is subject or which are assumed by the Company);

LGC03327

(ii)   the Member's distributive share of Net Profit, items thereof, and items of income and gain specially allocated pursuant to Section 5.01; and

(iii)   any other increases required by Treasury Regulation Section 1.704-1(b)(2)(iv).

(b)   Each Member's Capital Account shall be debited by:

(i)   any distributions of cash made from the Company to such Member plus the fair market value of any property distributed in kind to such Member (net of any liabilities to which such property is subject or which are assumed by such Member).

(ii)   the Member's distributive share of Net Loss, items thereof and deductions or losses specially allocated to such Member pursuant to Section 5.01; and

(iii)   any other decreases required by Treasury Regulation Section 1.704-1(b)(2)(iv). The provisions of this Section 3.03 relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Section 704(b) of the Code and the Treasury Regulations promulgated thereunder and shall be interpreted and applied in a manner consistent with those provisions.

3.04.   No Further Capital Contributions.   Except as expressly provided in this Agreement or with the prior written consent of the Members, no Member shall be required or entitled to contribute any other or further capital to the Company, nor shall any Member be required or entitled to loan any funds to the Company. No Member shall have any obligation to restore any negative balance in its Capital Account upon liquidation or dissolution of the Company.

3.05   Preference Return.   Each Member shall be entitled to a cumulative preference return on its Capital Contributions in Sections 3.01 and 3.02 at a rate of twenty-five percent (25%) per annum, compounded annually as of each December 31. The preference return shall be computed in the manner described in Section 3.06 and shall be distributed in the manner described in Section 5.02.

3.06   Preference Accounts.

(a)   Lennar shall be credited with an amount (a "First Preference Base") equal to its Capital Contributions to the Company under Section 3.01(a) as of the date each advance was made by Lennar. The credit balance of Lennar's First Preference Base shall be increased by Lennar's subsequent Capital Contributions under Section 3.01(a), and shall be reduced, but not below zero, by Lennar's distributions pursuant to Section 5.02(b). A cumulative preferential return

LGC03328

of twenty-five percent (25%) per annum compounded annually as of each December 31 on the credit balance of the First Preference Base shall accrue daily and shall commence as of the date of each advance made by Lennar under Section 3.01(a). The preferential return shall continue to accrue until (i) Lennar's First Preference Base has been reduced to zero (0) or (ii) termination of the Company, whichever occurs first. To account for such preferential return and for preferential distributions, the Company shall establish and maintain for Lennar an account ("First Memorandum Preference Account") to which shall be credited the preferential return to which Lennar is entitled pursuant to this Section 3.06(a) and to which shall be debited distributions of preferential return pursuant to Section 5.02(a).

(b)    Each Member shall be credited with an amount (a "Second Preference Base") equal to its Capital Contributions to the Company under Sections 3.01(b) and 3.01(c) as of the date each Capital Contribution was advanced or made. The credit balance of each Member's Second Preference Base shall be increased by such Member's subsequent Capital Contributions under Sections 3.01(b) and 3.01(c), and shall be reduced, but not below zero, by such Members distributions pursuant to Section 5.02(f). A cumulative, preferential return of twenty-five percent (25%) per annum compounded annually as of each December 31 on the credit balance of the Second Preference Base shall accrue daily and shall commence as of the date of the Member's first Capital Contribution under Sections 3.01(b) and 3.01(c) was advanced or made. The preferential return shall continue to accrue until (i) the Member's Second Preference Base has been reduced to zero (0) or (ii) termination of the Company, whichever occurs first. To account for such preferential return and for preferential distributions, the Company shall establish and maintain for each Member an account ("Second Memorandum Preference Account") to which shall be credited the preferential return to which the Member is entitled pursuant to this Section 3.06(b) and to which shall be debited distributions of such preferential return pursuant to Section 5.02(e).

(c)    Each Member shall be credited with an amount (a "Third Preference Base") equal to its Capital Contributions to the Company under Section 3.02. The credit balance of each Member's Third Preference Base shall be increased by such Member's subsequent Capital Contributions under Section 3.02 and shall be reduced, but not below zero, by such Member's distributions pursuant to Section 5.02(d). A cumulative preferential return of twenty-five percent (25%) per annum compounded annually as of each December 31 on the credit balance of the Third Preference Base shall accrue daily and shall commence as of the date of the Member's first Capital Contribution under Section 3.02. The preferential return shall continue to accrue until (i) the Member's Third Preference Base has been reduced to zero (0) or (ii) termination of the Company, whichever occurs first. To account for such preferential return and for preferential distributions, the Company shall establish and maintain for each Member an account ("Third Memorandum Preference Account") to which shall be credited the preferential return the Member is entitled to pursuant to this Section 3.06(c) and to which shall be debited distributions of such preferential return pursuant to Section 5.02(c).

SD\1087804-6

PW 3531

-16-

LSB\000553

LGC03329

## IV.  INTERESTS IN THE COMPANY

4.01  Return of Capital.  No Member shall be liable for the return of the capital contributions (or any portion thereof) of any other Member, it being expressly understood that any such return shall be made solely from the assets of the Company.  No Member shall be entitled to withdraw or receive a return of any part of its capital contributions or Capital Account, to receive interest on its capital contributions or Capital Account or to receive any distributions from the Company, except as expressly provided for in this Agreement or under applicable law.

4.02  Waiver of Partition.  Except as otherwise expressly provided for in this Agreement, each of the Members hereby irrevocably waives any right or power that such Member might have:

(a)  to cause the Company or any of its assets to be partitioned;

(b)  to cause the appointment of a receiver for all or any portion of the assets of the Company; or

(c)  to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law.

Each of the Members has been induced to enter into this Agreement in reliance upon the waivers set forth in this Section 4.02 and without those waivers no Member would have entered into this Agreement.

It is the intention of the Members that during the term of this Agreement, the rights of the Members and their successors-in-interest, as among themselves, shall be governed by the terms of this Agreement, and that the right of any Member or successor-in-interest to assign, transfer, sell or otherwise dispose of its Membership Interest shall be subject to the limitations and restrictions of this Agreement.

## V.  ALLOCATIONS AND DISTRIBUTIONS

5.01  Allocations

(a)  Except as provided in Section 5.01(c) below (which shall be applied first), any Net Profit of the Company shall be allocated as follows:

(i)  First, to any Members having negative Adjusted Capital Account balances, in proportion to and to the extent of such negative balances; and

SD\1087804-6

-17-

PM 3532

**LGC03330**

(ii)    The balance, if any, to the Members in such proportions and in such amounts as would result in the respective Adjusted Capital Account balance of each Member equaling, as nearly as possible, such Member's share of the then Company Capital determined by calculating the amount the Member would receive if an amount equal to the Company Capital were distributed to the Members in accordance with the provisions of Section 5.02 hereof.

(b)    Except as provided in Section 5.01(c) below (which shall be applied first), any Net Loss of the Company shall be allocated among the Members as follows:

(i)    First, to each Member with a positive Adjusted Capital Account balance, in the amount of such positive balance; provided, however, that if the amount of Net Loss to be allocated is less than the sum of the Adjusted Capital Account balances of all Members having positive Adjusted Capital Account balances, then the Net Loss shall be allocated to the Members in such proportions and in such amounts as would result in the respective Adjusted Capital Account balance of each Member equaling, as nearly as possible, such Member's share of the then Company Capital determined as set forth in Section 5.01(a)(ii) above; and

(ii)    The balance, if any, to the Members in accordance with their respective Percentage Interests.

(c)    Notwithstanding anything in Sections 5.01(a) or 5.01(b) to the contrary, the following allocations of the Net Profit and Net Loss and Items thereof shall be made.

(i)    If and to the extent that, for any fiscal year of the Company, any property or asset of the Company is encumbered by Nonrecourse Indebtedness, there shall be allocated to the Members in accordance with their respective Percentage Interests, the nonrecourse deductions (within the meaning of Section 1.704-2(b) of the Regulations) even though such allocation may result in a Member having a deficit balance in its Capital Account. The amount of nonrecourse deductions allocable for any fiscal year of the Company shall be equal to the net increase, if any, in the amount of the "partnership minimum gain" (as that term is defined in Sections 1.704-2(b)(2) and (d) of the Regulations) over the aggregate amount of any distributions during that fiscal year of proceeds of a nonrecourse loan that are allocable to an increase in partnership minimum gain for that fiscal year. If, for any subsequent fiscal year of the Company, there is a decrease in partnership minimum gain, there shall be specially allocated to each Member an amount of the gross income of the Company for such fiscal year (and, if necessary, for subsequent fiscal years) equal to the greater of (1) the portion of such Member's share of the net decrease in partnership minimum gain attributable to such "partner nonrecourse debt," determined in accordance with Section 1.704-2(g) of the Regulations, that is allocable to the disposition of the property that is subject to such partner nonrecourse debt, determined in accordance with Section 1.704-2(f) of the Regulations, or (2) if

SD\10678664.6

-18-

PW 3533

LGC03331

EXHIBIT A
Page 68

such Member would otherwise have a deficit balance in its, his or her Capital Account at the end of such year, an amount sufficient to eliminate that deficit balance. The determination of the amount, character and proportion of the gross income of the Company allocable to Members pursuant to this paragraph shall be made in accordance with Section 1.704-2(f) of the Regulations. This paragraph is intended, in compliance with Section 1.704-2 of the Regulations, to permit the allocation of nonrecourse deductions to be deemed to have substantial economic effect and shall be interpreted consistently to achieve that purpose.

(ii)    In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Regulations that results in a deficit balance in such Member's Capital Account, there shall be specially allocated to each Member who has a deficit balance in its, his or her Capital Account an amount of the gross income of the Company for such fiscal year (and, if necessary, for subsequent fiscal years) sufficient to eliminate that deficit balance as quickly as possible. The determination of the amount, character and proportion of the gross income of the Company allocable to Members pursuant to this Section shall be made in accordance with Section 1.704-1(b)(2)(ii)(d) of the Regulations. This paragraph is intended, in compliance with Section 1.704-1(b)(2)(ii) of the Regulations, to constitute a "qualified income offset" in order to assure that any allocation of Net Loss of the Company has "economic effect" within the meaning of such Regulations and shall be interpreted consistently to achieve that purpose.

(iii)    In accordance with Section 704(c) of the Code and the Regulations thereunder, taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for Federal income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such property for Federal income tax purposes and its fair market value, as recorded on the books of the Company. In the event that any change is made in the Percentage Interest of any Member (whether incident to the admission of a new member, the making of an additional Capital Contribution by an existing Member, the distribution of property to a Member or the liquidation of the Company (within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations)) that reflects a change in the fair market value of the property of the Company, subsequent allocations of taxable income, gain, loss and deduction with respect to such property shall take into account any variation between the adjusted basis of such property for Federal income tax purposes and its adjusted fair market value, as recorded on the books of the Company. Allocations under this paragraph shall be made solely for Federal income tax purposes and shall not affect or be taken into account in computing any Member's Capital Account or share of the Net Profit, Net Loss or distributions of the Company.

(iv)    To the extent that an adjustment to the adjusted basis of any asset of the Company pursuant to Section 734(b) or Section 743(b) of the Code is required, pursuant to Section 1.704-1(b)(2)(iv)(m) of the Regulations, to be

SD\1087806-4

-19-

PM 3534

LGC03332

EXHIBIT A
Page 69

taken into account in determining Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and such gain or loss shall be specially allocated in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to the Regulations.

(v)    To the extent any allocation of Net Profit or Net Loss pursuant to Sections 5.01(a) or 5.01(b) for any fiscal year resulted in any Member receiving a disproportionately small amount of Net Profit or disproportionately large amount of Net Loss, in subsequent years there shall be allocations of Net Profit or Net Loss, as the case may be, to reverse such disproportionate allocations, provided, however, that such reversal shall comply with Section 1.514(c)-2(e)(1)(i) and (e)(2) of the Regulations.

(d)    If the amount of Net Profit allocable to the Members pursuant to Section 5.01(a)(ii) or the amount of Net Loss allocable to them pursuant to Section 5.01(b)(i) is insufficient to allow the Adjusted Capital Account balance of each Member to equal such Member's share of the Company Capital, such Net Profit or Net Loss shall be allocated among the Members in such a manner as to decrease the differences between the Members' respective Adjusted Capital Account balances and their respective shares of the Company Capital in proportion to such differences.

(e)    Allocations of Net Profit and Net Loss provided for in this Section 5.01 shall generally be made as of the end of the fiscal year of the Company.

(f)    The opinion of the certified public accountant retained by the Company concerning the computation of the Net Profit and Net Loss of the Company and the allocation thereof and of taxable income, loss, deduction, credit or other allowance among the Members and all determinations of distributions to be made under Section 5.02 shall be final and binding with respect to all disputes concerning those computations.

5.02   Distributions.  Except as provided in Section 5.04, the Company shall, after establishment of reasonable reserves by the Executive Committee, make distributions (but no less often than quarterly) of all Net Cash Flow (to the extent available) from Revenues to the Members in the following manner and order of priority (each a "Distribution"):

(a)    First, to Lennar in an amount equal to the then current credit balance of its First Memorandum Preference Account;

(b)    Second, to Lennar, in an amount equal to its Capital Contributions under Section 3.01(a), less any amounts previously distributed under this Section 5.02(b);

**LGC03333**

(c)    Third, to the Members, in proportion to the then current credit balances in their Third Memorandum Preference Accounts, up to the full amount thereof;

(d)    Fourth, to the Members, in proportion to their Additional Capital Contributions under Section 3.02 up to the full amount thereof, less any amounts previously distributed under this Section 5.02(d);

(e)    Fifth, to the Members, in proportion to the then current credit balances of their Second Memorandum Preference Accounts, up to the full amount thereof;

(f)    Sixth, to the Members, in proportion to their Capital Contributions under Sections 3.01(b) and 3.01(c), up to the full amount thereof, less any amounts previously distributed under this Section 5.02(f); and

(g)    Thereafter, to the Members, in proportion to their Payout Interests.

To the extent that non-cash consideration shall be distributed in kind pursuant to this Section, the fair market value of such assets shall first be determined and the distribution of such assets shall be made in accordance with such valuation after first allocating to the Capital Accounts of the Members the amount of net Profit or Net Loss which would have been allocated to said capital accounts if the non-cash consideration had been sold at such fair market value rather than distributed in kind.

5.03    Tax Distribution.  Notwithstanding any other provision of this Agreement, the Company shall make distributions to each Member for each year on or before March 15 of the following year equal to the amount which is the result of multiplying the Tax Rate (as hereinafter defined) by the Net Profit of the Company allocable to the Member for such year.  The Tax Rate for each Member shall be the highest marginal combined federal and state income tax rate for such member as determined in good faith by the Member's accountant.  Any amount distributed under this Section 5.03 shall be taken into account in computing subsequent distributions under Section 5.02 so that the total amount distributed under this Section 5.03 and Section 5.02 shall be the amount which would have been distributed under Section 5.02 if the distribution under this Section 5.03 had not occurred.

5.04    Special Distribution.  Marsch shall be distributed unencumbered fee title to the Real Estate Sales Facility when the project real estate is sold out, which shall not be subject to any Buy-Sell described in Article VII.  The Real Estate Sales Facility shall be the only real estate facility providing real estate services permitted to be located onsite within the Project.  The Company shall provide resale services within the Project until such time as the Real Estate Sales Facility is distributed to

SD\1047804-6

-21-

*[handwritten:] If future circumstances permit: Define the "Williams interest." Then, upon termination of the Williams interest.*    PW 3536

LGC03334

Marsch. Thereafter, Marsch shall have the sole and exclusive right to provide resale services from a site located within the Project.

5.05   Distributions in Liquidation.  Upon the dissolution and winding-up of the Company, the proceeds of sale and other assets of the Company distributable to the Members under Section 10.03(c)(iii) shall be distributed not later than the latest time specified for such distributions pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(2), to the Members in proportion to and in accordance with their respective positive Capital Account balances (after adjustment to reflect the allocations pursuant to Article V).  With the approval of the Executive Committee, a pro rata portion of the distributions that would otherwise be made to the Members under the preceding sentence may be distributed to a trust established for the benefit of the Members for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company arising out of or in connection with the Company.  The assets of any trust established under this Section 5.05 shall be distributed to the Members from time to time by the trustee of the trust upon approval of the Executive Committee in the same proportions as the amount distributed to the trust by the Company would otherwise have been distributed to the Members under this Agreement.

5.06   Tax Matters Partner.  Lennar shall be the tax matters partner within the meaning of Section 6231(a)(7) of the Code, provided that Lennar shall not have any right to settle or compromise any matter raised by the Internal Revenue Service without the approval of the Executive Committee.

5.07   Tax Matters.  The tax matters partner shall make all applicable elections, determinations and other decisions under the Code, including, without being limited to, the deductibility of a particular item of expense and the positions to be taken on the Company's tax return, and the Executive Committee shall approve the settlement or compromise of all audit matters raised by the Internal Revenue Service affecting the Members generally.  The Members shall each take reporting positions on their respective federal, state and local income tax returns consistent with the positions determined for the Company.  Lennar shall cause all federal, state and local income and other tax returns to be timely filed by the Company.

5.08   Certain Payments to the Internal Revenue Service Treated as Distributions.  Notwithstanding anything to the contrary herein, to the extent the Company is required, or elects, pursuant to applicable law, either (i) to pay tax (including estimated tax) on a Member's share of Company items of income or gain, whether or not distributed, or (ii) to withhold and pay over to the tax authorities any portion of a distribution otherwise distributable to a Member, the Company may pay over such tax or such withheld amount to the tax authorities, and such amount shall be treated as a distribution to such Member at the time it is paid to the tax authorities.

LGC03335

EXHIBIT A
Page 72

## VI.  MANAGEMENT

6.01  Management.

(a)     Except as otherwise expressly provided in this Agreement, the day-to-day business, operations and affairs of the Company shall be managed by the Project Manager, which may be an individual or an entity.  The Members hereby agree that the Project Manager shall be selected by Lennar and Marsch after considering candidates submitted by Marsch and candidates submitted by Lennar. The Project Manager shall receive a market rate for services rendered as project management fees.

(b)     The Project Manager shall have the powers, duties and authority described in this Article VI and, except as otherwise provided herein, under the Act and shall be accountable to the Members as a fiduciary.  The Project Manager shall manage the business of the Company in accordance with the Business Plan.  In carrying out the Business Plan, the Project Manager shall regularly inform the Members of all significant business decisions and provide the Members with a quarterly operating, sales, progress and budget variance reports.  Subject to the provisions of Sections 6.01(e) and 6.02, the Project Manager has the power, together with the responsibility, to implement the Business Plan on behalf of the Company and to perform all acts specifically contemplated thereby, including, without limitation, causing the Company to enter into contracts; to sell, assign, or transfer for value the Property in lots set forth in the Business Plan; to enter into contracts to provide construction, renovation, repair, organizational, managerial or other services, to exercise and fulfill the rights, powers and duties of the Company, acting in its capacity as general or limited partner, shareholder, member or beneficiary of any Sub-Entity in which it is an investor; to employ from time to time persons, firms or corporations in the operation of the Company business, on such terms and for such reasonable compensation as the Project Manager shall determine; to employ, engage or retain any Persons to act as brokers, accountants, attorneys, engineers or in such other capacities as the Project Manager may determine are necessary or desirable in connection with the Company's business, and the Project Manager shall be entitled to rely in good faith upon the recommendations, reports and advice given them by any such persons in the course of their professional engagement; and to execute, acknowledge and deliver any and all instruments deemed reasonably necessary by the Project Manager to effectuate the foregoing, including but not limited to those necessary to comply with applicable governmental requirements.  By way of extension of the foregoing and not in limitation thereof, the Project Manager shall, except as otherwise provided in this Agreement, have all the rights and powers granted to a manager by the Act.  The Company shall compensate the Project Manager on such reasonable basis as may be mutually agreeable to the Company and the Project Manager.

PW 3538

LST4000560

LGC03336

EXHIBIT A
Page 73

(c). The Project Manager shall deliver to Lennar and Marsch promptly upon the receipt or sending thereof, copies of all notices and reports between the Company and any builder under a lot purchase agreement or any holder of a mortgage affecting all or any portion of any Company Property which relates to any existing or pending default thereunder or to any financial or operational information required by such Person; deposit all receipts from operations or sales of the Company Property to a separate account established and maintained by the Project Manager, and shall not commingle those receipts with any other funds or accounts of the Project Manager.

(d) Anything to the contrary provided herein notwithstanding, the Project Manager shall not be obligated to make any expenditures or advance any funds on behalf of the Company except from the accounts of funds of the Company.

(e) The Executive Committee shall decide all matters not included in the Business Plan or any change from the Business Plan.

6.02 Members of the Executive Committee.

(a) The Executive Committee shall be comprised of four individuals, two appointed by Lennar and two by Marsch. The initial members of the Executive Committee shall be Jonathan M. Jaffe and Mark Chasman, appointed by Lennar, and Nicolas Marsch III and another individual to be appointed by Marsch. Lennar shall have the right, exercisable by written notice to Marsch, to remove any individual appointed by Lennar and appoint a substitute therefor, and Marsch shall have the right, exercisable by written notice to Lennar, to remove any individual appointed by Marsch and appoint a substitute therefor; provided, however, that any new individual appointed to the Executive Committee by Lennar or Marsch must be approved by the Executive Committee members appointed by the non-appointing party, such approval not to be unreasonably withheld.

(b) A quorum of the Executive Committee shall be three members, and all decisions by the Executive Committee shall require the affirmative vote of three of the members of the Executive Committee at a meeting at which a quorum is present. The Executive Committee shall meet from time to time, as often as necessary or desirable to carry out its management functions. The Executive Committee members shall receive at least 10 days' written notice of any meeting of the Executive Committee, unless the notice requirement is waived by all members. Any member of the Executive Committee may convene a meeting thereof upon at least ten business days' prior notice to the other members of the Executive Committee specifying the date, time and place of meeting and the agenda for the meeting. The Executive Committee may also hold meetings by telephone and may make decisions by written consent of all of the members of the Executive Committee. A written record of all meetings of the Executive Committee and all decisions made by it shall be made by the Project Manager, as Secretary of the Executive Committee, and kept in the records of the Company and shall be initialed or signed by all of the members

LGC03337

of the Executive Committee. The approval of the Business Plan shall be evidenced by all of the Executive Committee members signing or initialing a copy of the approved version. Minutes and/or resolutions of the Executive Committee, when signed by all of the Executive Committee Members shall be binding and conclusive evidence of the decisions reflected therein and any authorizations granted thereby. Each member of the Executive Committee shall be free to represent the views and positions of the Members by whom he was appointed.

(c)    The Executive Committee shall be responsible for all decisions which are not delegated by the Executive Committee to the Project Manager.

(d)    Except as provided herein or as otherwise decided by the Executive Committee, no member thereof shall be entitled to receive any salary or other remuneration or expense reimbursement from the Company for his services as a member of the Executive Committee.

(e)    Notwithstanding anything contained in this Agreement to the contrary, the Company's entering into any contract with a Member or an Affiliate of a Member shall require the prior written approval of the non-interested Members. Further, the following decisions to be made by the Company relative to any such contract shall be made solely by the non-interested Member(s): (i) any amendment, modification, termination or renewal thereof; (ii) declaring a default thereunder; (iii) instituting, settling or compromising a claim with respect thereto; (iv) waiving any rights of the Company against the other party thereto; or (v) consenting to the assignment of any rights or the delegation of any duties by the other party thereto.

6.03    Business Plan.

(a)    A Business Plan shall be attached hereto as Schedule D. In the event the Business Plan is not attached or is incomplete, the Executive Committee will cause the preparation or completion of the Business Plan and will attach it hereto forthwith. The Members shall have the right to approve such Business Plan and shall thereafter conduct activities consistent with the Business Plan.

(b)    The Business Plan shall consist of a budget and strategic operating plan for the Company, which sets forth all anticipated income, operating expenses and capital and other costs and expenses of the Company. In formulating the comprehensive Business Plan, to the extent reasonably feasible at the time of preparation thereof, the Executive Committee shall develop plans for development, construction, operating, and marketing of the Property, including a separate development budget for each Parcel (as the case may be) which the Company plans to start development work in the coming year; general information concerning golf course design and configuration relative to Parcels (as the case may be) designated for future residential development, lot sizes, zoning and platting modifications; terms for any proposed sale or disposition of any Company Property, and individual lot

SD\1057804-6

-25-

PW 3540

LGC03338

EXHIBIT A
Page 75

prices and projected take-down schedules, for the Company to efficiently implement the Business Plan.

### 6.04 Duties and Conflicts.

(a)    The Members and their respective officers, employees and Affiliates shall devote such time to the Company business as they deem to be necessary or desirable in connection with their respective duties and responsibilities hereunder. Except as set forth in the Business Plan or as otherwise agreed to in writing by the Members, or as approved by the Executive Committee or as set forth in this Agreement, no Member nor any partner, member, shareholder, officer, director, employee, agent or representative of any Member shall receive any salary or other remuneration for its services rendered pursuant to this Agreement.

(b)    Each of the Members recognizes that each of the other Members and its partners, members, shareholders, officers, directors, employees, agents, representatives and Affiliates, have or may have other business interests, activities and investments, some of which may be in the same business of the Company inasmuch that they involve the acquisition, development and sale of real property. Each of the Members recognizes that the other Members and its partners, members, shareholders, officers and directors, employees, agents, representatives and Affiliates, are entitled to carry on such other business interests, activities and investments, so long as they do not involve the Property, the Project or any other properties related thereto. Subject to the foregoing, each of the Members may engage in or possess an interest in any other business or venture of any kind, independently or with others, including, without being limited to, owning, financing, acquiring, leasing, promoting, developing, improving, operating, managing and servicing real property on its own behalf or on behalf of other entities with which any of the Members is affiliated or otherwise, and each of the Members may engage in any such activities without any obligation to offer any interest in such activities to the Company or to the other Members. Neither the Company nor the other Members shall have any right, by virtue of this Agreement, in or to such activities, or the income or profits derived therefrom, and the pursuit of such activities, even if competitive with the business of the Company, shall not be deemed wrongful or improper.

(c)    Marsch and Lennar agree that any real estate purchase, exchange, development, management, financing, brokerage, sale or resale opportunity adjacent, or related to the Project shall be considered a Company opportunity, and neither Marsch nor Lennar shall pursue such opportunity without first presenting it to the Company. This is not meant to preclude (i) separate homebuilding activities in the Project undertaken by Marsch or Lennar on the Property or adjacent property or (ii) either party engaging in non-Project related real estate acquisition and development activities alone or with others in the Rancho Santa Fe area.

SD\1047806-6                                   -26-                                   PW 3541

**LGC03339**

6.05  Services of Marsch. Distributions to Marsch and Lennar. [Consulting fee]

(a)    Marsch will provide historical, developmental, and other assistance in conjunction with the Project Manager, but will have no daily operational responsibility with respect to development of the Project. As compensation for his services, Marsch shall (i) be paid a management fee equal to $250,000 annually, paid in equal quarterly installments on the first day of each quarter, with a COL Adjustment each 24 months and (ii) be paid an overhead fee of $60,000 annually, paid in equal quarterly installments on the first day of each quarter, with a COL Adjustment each 24 months. Both (i) and (ii) above shall be included in the Business Plan as a cost item for accounting purposes. The fees described in this Section 6.05(a) shall be a guaranteed payment to Marsch under Code Section 707(c) and shall not reduce, or be reduced by, any distribution made to Marsch.

[See 1st Amendment dated 4/1/98]

(b)    Marsch and Lennar shall each receive an override fee equal to 3½% of gross sales of all products, including but not limited to, lots, builder participation, and memberships, excluding monthly dues, within or related to the Project. The fee shall be paid promptly at the time of receipt of funds from such sales, and shall not be subject to offset, deductions or adjustments of any kind. The right to receive such fees shall vest immediately upon the Closing Date and shall not be subject to any Buy-Sell described in Article VII.

[Termination of the Lennar interest]

(c)    Marsch and Lennar shall each receive a resale transfer fee equal to fifty percent (50%) of the resale transfer fees payable to the Company with respect to the Property, to be paid to Marsch and Lennar when such resale transfer fees are received by the Company, or accumulated and paid to Marsch and Lennar no less frequently than quarterly. The right to receive such fees shall vest immediately upon the Closing Date and shall not be subject to any Buy-Sell described in Article VII.

(d)    Following the execution of this Agreement, the Members shall, upon the request of Marsch, execute such documents as are necessary to cause the fees set forth in Sections 6.05(a), (b) and (c) to be paid to entities controlled by Marsch and/or Lennar, as appropriate, under separate written agreements.

6.06  Prior Investors. The Company shall satisfy the claims of the Prior Investors in accordance with the Business Plan. The Members contemplate that the satisfaction of such claims will occur within six months after the Closing Date. As a condition to the Company's payment of any settlement sums to the Prior Investors, the Company and its Members shall receive a general release in form and substance satisfactory to the Company. Lennar may contribute capital for the purpose of funding the Company's satisfaction of such claims, including without limitation the satisfaction of claims in excess of an aggregate of $5,000,000 plus or minus plus a return.

LGC03340

## VII. BUY-SELL PROVISIONS

### 7.01 General Provisions.

(a)    The provisions of this Article VII may be invoked by either Marsch or Lennar upon the expiration of six (6) months after the Closing Date. The items described in Sections 5.04, 6.05(b) and 6.05(c) shall not be subject to this Article VII.

(b)    Lennar or Marsch may invoke the procedure (the "Buy-Sell Procedure") set forth herein by delivering a written notice (the "Offer Notice") to the other party or parties. The party or parties giving the Offer Notice are referred to herein as the "Offeror" and the party or parties receiving the Offer Notice are referred to herein as the "Offeree." The Offer Notice shall contain a stated amount (the "Buy-Sell Price") at which the Offeror would purchase all of the assets of the Company as if such assets were free and clear of all liens, claims and encumbrances. The Offer Notice shall also include a statement of (i) all Company liabilities of which the Offeror has knowledge; (ii) the other major economic terms and conditions upon which the Offeror would be willing to purchase from the Offeree its Membership Interest in the Company, including its interest in any loans to the Company (and in such case, under the circumstances described below, those same terms and conditions shall apply to the sale by the Offeror to the Offeree of its Membership Interest in the Company, consistent with the terms of the alternative elections set forth below in Section 7.01(e)); and (iii) the terms and details of any discussion, refinancing or proposed sale that the Offeror has entertained, negotiated or discussed during the last 180 calendar days with any third party for all or any portion of the Company's assets. The Offer Notice shall constitute an irrevocable offer by the Offeror to effect the alternative transactions set forth in Section 7.01(e) below.

(c)    A copy of the Offer Notice shall be delivered to the Company Accountant who shall, within 15 calendar days, determine and notify the Members as to the amount each Member comprising the Offeree would receive (the "Offeree Value") and the amount each Member comprising the Offeror would receive (the "Offeror Value") on account of its Membership Interest in the Company and any loans made by such Members to the Company if all Company assets were sold for the Buy-Sell Price, all liabilities of the Company (including any loans by any such Member to the Company) were paid in full, and the remaining proceeds distributed to the Members in accordance with Section 5.02. The Company Accountant's computation shall not include the items described in Sections 5.04, 6.05(b) and 6.05(c).

(d)    If the Buy-Sell Procedure is initiated, the Offeree shall have the right, exercisable by delivery of notice in writing (the "Election Notice") to the Offeror within 120 calendar days from the receipt of the determination of the Offeree Value from the Company Accountant, to elect to either:

PW 3543

LGC03341